## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, 1307 New York Ave NW #300, Washington, DC 20005, | : : : : : : | Case No. |
| NATIONAL CENTER FOR TEACHER RESIDENCIES, 1332 N. Halsted Street, Suite 304 Chicago, IL 60642. | : : : : : |
| and, | : : |
| THE MARYLAND ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, 304 Hawkins Hall Towson University, Towson, MD. 21252 | : : : : : : : : |
| *Plaintiffs*, | : : |
| v. | : : |
| DENISE CARTER, in her official capacity as Acting Secretary of Education 400 Maryland Avenue, SW Washington, DC 20202, | : : : : : |
| U.S. DEPARTMENT OF EDUCATION, 400 Maryland Avenue, SW Washington, DC 20202, | : : : : |
| and, | : : |
| DONALD J. TRUMP, in his official capacity as President of the United States, c/o Attorney General of the United States U.S. Department of Justice 950 Pennsylvania Avenue, NW Washington, DC 20530-0001 | : : : : : : : |
| *Defendants*. | : : |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs the American Association of Colleges for Teacher Education ("AACTE"), the National Center for Teacher Residencies ("NCTR"), and the Maryland Association of Colleges for Teacher Education ("MACTE") (collectively, "Plaintiffs") file this action against Defendants Denise Carter, in her official capacity as Acting Secretary of Education, the United States Department of Education (the "Department"), and Donald Trump, in his official capacity as President of the United States (collectively, "Defendants"), for declaratory and injunctive relief.

AACTE's, NCTR's, and MACTE's members together comprise hundreds of teacher preparation programs throughout the United States. Many of Plaintiffs' members received grants from the Department through the Teacher Quality Partnership Program ("TQP"), the Supporting Effective Educator Development Program ("SEED"), and the Teacher and School Leader Incentive Program ("TSL"), which were used to fund programs to prepare and develop educators. Without prior warning, and in reliance on the President's recent Executive Order regarding DEI initiatives, the Department of Education recently summarily terminated many of Plaintiffs' members' TQP, SEED, and TSL grants. Not only were those terminations unlawful in reliance on Executive Order 14151, the Department also failed to follow statute and Federal regulations in terminating the grants, making the terminations unlawful under the Administrative Procedures Act too.

In the years that the Department of Education held competitions to award TQP, SEED, and TSL grants, the Department selected Priorities for applicants from a set of allowable agency Priorities enacted through a rulemaking process required by statute. These Priorities were used in the competitions to award TQP, SEED, and TSL grants to AACTE's and MACTE's member organizations and to NCTR and its member organizations. Pursuant to statute and Department

2

regulation, Priorities for any competitive grant program must generally be set by Congress or through notice and comment rulemaking by the Department.[1] Only then can the final published agency Priorities apply to the competitive grant programs for selection of grantees in a particular fiscal year.

In compliance with statute and its regulation, the Department followed the notice and comment rulemaking process and established several Priorities that were allowable at the time the TQP, SEED, and TSL grants' Notices for Inviting Applications at issue in this case were published in the *Federal Register* in 2020, 2022, 2023, and 2024. The Department then awarded AACTE's and MACTE's member organizations and NCTR and its member organizations up to five-year TQP grants, up to three-year SEED grants, and/or up to three-year TSL grants that remained active through early to mid-February 2025.

But in February 2025, the Department summarily terminated grants awarded under TQP, SEED, and TSL. The purported basis provided by the Department for termination was that the grants are "inconsistent with, and no longer effectuate[], Department priorities." In form letters sent along with the official termination notifications, the Department explained that:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education….the grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race,

---

[1] While there are limited exceptions to this general rule, none of those exceptions are applicable here.

color, religion, sex, national origin, or another protected
characteristic; that violate either the letter or purpose of Federal civil
rights law; that conflict with the Department's policy of prioritizing
merit, fairness, and excellence in education; that are not free from
fraud, abuse, or duplication; or that otherwise fail to serve the best
interests of the United States. The grant is therefore inconsistent
with, and no longer effectuates, Department priorities.

After terminating AACTE's and MATCE's member organizations' and NCTR's and its

member organizations' TQP and SEED grants, the Department issued a press release titled "U.S.

Department of Education Cuts $600 Million in Grants Used to Train Teachers and Education

Agencies on Divisive Ideologies." *See* https://www.ed.gov/about/news/press-release/us-

department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

Neither the Department's "official" reason for terminating the grants, as articulated in the

Grant Award Notifications regarding Department Priorities, nor its actual, publicly-articulated

reason for termination regarding DEI initiatives, were lawful. The "official" justification is

unlawful because the federal government has published a regulation governing the termination of

grants that the Department did not follow here. The Department's publicly articulated reason for

terminating the grants was unlawful because it was predicated on portions of an Executive Order

that has been enjoined by this Court.

The Department's stated reason relied, erroneously, on an implied change in "Department

priorities." Department Priorities," however, is a term of art; they are not subject to whim or fiat

and, by statute, must instead be established through notice and comment rulemaking. The

Department Priorities applicable to Plaintiffs' members' TQP, SEED, and TSL grants are the same

today as they were when the grants were awarded because (a) no subsequent rulemaking has taken

place; and (b) the statutes that established Priorities allowable for TQP, SEED, and TSL have not

been repealed or amended. Given that the Department Priorities have not changed, and the grants

were determined to meet the still-current Priorities during the competition process, it would be arbitrary *per se* for the Department to conclude that these grants are not consistent with or do not effectuate those same "Department Priorities" now.

As a result of the Department's improper early terminations, the Grant Recipients have been and will continue to be deprived of essential funding required to continue their teacher preparation programs and the continuation of the Department's unlawful terminations will irreparably harm Plaintiffs and their members. As such, Plaintiffs respectfully request that this Court award relief to address the irreparable harm that continues to result from Defendants' unlawful actions.

In support of their claims, Plaintiffs further aver as follows:

1.    The Supporting Effective Educator Development Program, authorized by Congress under section 2242 of the Elementary and Secondary Education Act of 1965, as amended (20 U.S.C. § 6672), provides funding to increase the number of highly effective educators in the United States by supporting the implementation of evidence-based practices that prepare, develop, or enhance the skills of educators. SEED was authorized in statute to support educators' development across the continuum of their careers and requires the Secretary of the Department of Education to award grants to eligible entities for the purpose of:

> (1) providing teachers, principals, or other school leaders from nontraditional preparation and certification routes or pathways to serve in traditionally underserved local educational agencies;
>
> (2) providing evidence-based professional development activities that address literacy, numeracy, remedial, or other needs of local educational agencies and the students the agencies serve;
>
> (3) providing teachers, principals, or other school leaders with professional development activities that enhance or enable the provision of postsecondary coursework through dual or concurrent enrollment programs and early college high school settings across a local educational agency;

(4) making freely available services and learning opportunities to local educational agencies, through partnerships and cooperative agreements or by making the services or opportunities publicly accessible through electronic means; or

(5) providing teachers, principals, or other school leaders with evidence-based professional enhancement activities, which may include activities that lead to an advanced credential.

20 U.S.C. § 6672(a).

2.     The Teacher Quality Partnership Grant Program, authorized by section 202 of the Higher Education Act of 1965, as amended (20 U.S.C. § 1022), provides funding to eligible partnerships to improve student achievement; improve the quality of prospective and new teachers by improving the preparation of prospective teachers and enhancing professional development activities for new teachers; hold teacher preparation programs at institutions of higher education accountable for preparing teachers who meet applicable State certification and licensure requirements; and recruit highly qualified individuals, including individuals of color and individuals from other occupations, into the teaching force. TQP funds teacher preparation programs at the pre-baccalaureate or "fifth-year" level, and teaching residency programs for individuals new to teaching, or mid-career professionals from outside the field of education, with strong academic and professional backgrounds.

3.     The Teacher and School Leader Incentive Program, authorized by section 2212 of the Elementary and Secondary Education Act of 1965, as amended (20 U.S.C. § 6632), serves educators in high-need schools who raise student academic achievement and close the achievement gap between high- and low-performing students. TSL helps develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems for teachers, principals, or other school leaders.

4.      Plaintiff AACTE's and MACTE's member organizations and Plaintiff NCTR and its member organizations (the "Grant Recipients") receive TQP, SEED, and/or TSL funding through grants awarded by the Department of Education. Specifically, the Grant Recipients were awarded up to five-year TQP grants through the FY 2020 TQP competition, FY 2022 TQP competition, and FY 2024 TQP competition, up to three-year SEED grants through the FY 2022 SEED competition, and up to three-year TSL grants though the FY 2023 TSL competition.

5.      In February 2025, the majority of the Grant Recipients received updated Grant Award Notifications and form letters from the Department ("Termination Letters") terminating their TQP, SEED, and TSL grants.[2] True and correct representative copies of the Grant Award Notifications are attached as **Exhibit A**. True and correct representative copies of the Termination Letters are attached as **Exhibit B**.

6.      All of the Grant Recipients are similarly situated because the substance of each Termination Letter and added terms and conditions in the Grant Award Notifications from the Department are identical, indicating the same reasons with the same terminology for the grant terminations. *See* Exhibits A, B.

7.      In terminating the Grant Recipients' TQP, SEED, and TSL grants in their entirety, effective the same day as the termination letters were sent/dated, the updated Grant Award Notifications provided the following reason for termination: "The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities." (Exhibit A at pages 4, 10, 16, 22, 28, 34, 40). The Termination Letter articulated the same reason along with additional language regarding DEI initiatives:

> The grant specified above provides funding for programs that promote or
> take part in DEI initiatives or other initiatives that unlawfully discriminate

---

[2] While the Department terminated the majority of the Grant Recipients' grants, some of Plaintiffs' member organizations did not have their TQP grants terminated yet.

on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. **The grant is therefore inconsistent with, and no longer effectuates, Department priorities**. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [] in its entirety effective 2/[]/25.

Exhibit B at pages 1, 3, 5, 7, 9, 11, 13 (emphasis added).

8.     The Department's articulated basis for terminating the grants and denying access to the funds is contrary to statute and regulations, and the immediate termination constitutes final agency action that is arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act ("APA").

9.     The Grant Recipients offer programs to provide supports to improve the quality of teaching and school leadership. The unlawful termination of the TQP, SEED, and TSL grants will force the immediate closure of many of these programs and irreparably harm the Grant Recipients and the educators, students, and communities they serve. Plaintiffs thus bring this action to enjoin Defendants from terminating the TQP, SEED, and TSL grants.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action because the claims arise under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because Defendants are United States officials, *see* 28 U.S.C. § 1346(a)(2). This Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), (e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official

capacity, and a substantial part of the events or omissions giving rise to the claims occurred in this District, and Plaintiff MACTE resides in this district.

## PARTIES

12.    Plaintiff American Association of Colleges for Teacher Education is a nonprofit association of educator preparation programs, comprised of hundreds of public and private colleges and universities and nonprofit organizations.[3] AACTE's member organizations prepare professional educators across the United States and its territories, encompassing teachers, counselors, PK-12 administrators, and college faculty. AACTE's mission is to elevate education and educator preparation through research, professional practice, advocacy, and collaboration. The termination of the TQP, SEED, and TSL grants directly threatens this mission. These grants fund initiatives that benefit PK-12 students and schools nationwide by supporting innovative approaches to educator preparation and professional development. Through their work, grantees produce evidence-based practices that lead to the preparation of highly qualified teachers, principals, and school-based educators. As the nation's largest organization dedicated to educator preparation, AACTE prioritizes ensuring that every child has access to credentialed, well-prepared educators. These grants are vital to that goal. AACTE plays a crucial role in amplifying their impact by sharing grantees' research, policy insights, and best practices with the broader education community through publications, convenings, annual meetings, and other resources. Preserving these funding sources is essential to sustaining and advancing the quality of educator preparation and, ultimately, student success. AACTE's principal place of business is 1602 L St., NW, Suite 601, Washington, DC 20036.

---

[3] AACTE's member organizations can be found at https://aacte.org/membership/our-members/.

13.    Plaintiff The National Center for Teacher Residencies supports the design of new teacher residency programs and provides consulting to strengthen existing programs across the United States. NCTR is comprised of dozens of network members, including colleges, universities, and nonprofit teaching organizations.[4] NCTR's mission is to transform educator preparation by advancing the teacher residency movement to prepare, support, and retain more effective educators who represent and value the communities they serve. The termination of the TQP, SEED, and TSL grants implicates NCTR's core mission because it removes the financial supports needed to reduce tuition costs for aspiring teachers called teacher residents, pay host K-12 teachers for the work they are doing to support the aspiring teachers, offset the cost for licensure examinations and test prep workshops, and provide a stipend or pay for work the teacher residents are completing through their internships. Without these necessary supports, teacher residencies will be unable to continue to lower the financial barrier to becoming a teacher and ensure the necessary comprehensive preparation is provided to prepare future teachers. NCTR's principal place of business is 1332 N. Halsted Street, Suite 304 Chicago, IL 60642.

14.    Plaintiff the Maryland Association of Colleges for Teacher Education is a membership organization with a mission to serve as a distinct statewide voice on matters of importance to educator preparation programs at Maryland's colleges and universities. AACTE and MACTE collaborate to strengthen their advocacy efforts, share experience and expertise, and expand their members' professional development opportunities. MACTE's members include regionally accredited colleges and universities engaged in the preparation of professional school personnel with state program approval. In addition to hosting regular professional learning activities, MACTE serves on the Council of Educational, Administrative and Supervisory

---

[4] NCTR's member organizations can be found at https://nctresidencies.org/nctr-network/members/.

Organizations of Maryland Leadership Team, nominates three representatives to serve on the Professional Standards and Teacher Education Board, and represents Maryland preparation programs at AACTE. The termination of the TQP and SEED grants implicates MACTE's core mission. MACTE serves the institutions of higher education in Maryland for both the recruitment and retention of future teachers as well as the support and advancement of current classroom teachers. Both the TQP and SEED grants were focused on recruitment, retention of future teachers as well as the support of practicing teachers in Maryland. MACTE's principal place of business is 304 Hawkins Hall, Townson University, Townson, MD 21252.

15.    Defendant Denise Carter is the Acting Secretary of Education and is sued in her official capacity.

16.    Defendant the United States Department of Education is an agency of the United States.

17.    Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

**FACTUAL AND LEGAL BACKGROUND**

**I.    Overview of Agency Priorities.**

18.    In 2008, Congress authorized TQP to support high-quality teacher preparation and professional development for prospective teachers and school leaders. In 2015, Congress authorized SEED to increase the number of highly effective educators by supporting the implementation of evidence-based practices that prepare, develop, or enhance the skills of teachers, principals, or other school leaders. Also in 2015, Congress authorized TSL to assist local educational agencies and nonprofit organizations to develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems

for teachers, principals, or other school leaders, especially for teachers, principals, or other school leaders in high-need schools who raise student growth and academic achievement and close the achievement gap between high- and low-performing students.

19.    Congress directed the Secretary of the Department of Education to award grants, on a competitive basis, to eligible entities to provide funding consistent with the goals of TQP (20 U.S.C. § 1022a(a)), SEED (20 U.S.C. § 6672(a)), and TSL (20 U.S.C. § 6632(a)).

20.    Federal regulations govern the procedures and the basis by which a Federal agency, such as the Department of Education, may terminate a Federal award. *See* 85 F.R. 49506-49582. A Federal award may be terminated by the Federal agency or pass-through entity if an award no longer effectuates the program goals or agency priorities. *See* 2 C.F.R. § 200.340(a)(2) (2020); *see also* 2 C.F.R. § 200.340(a)(4) (2024).

21.    The Secretary of Education (the "Secretary") is required to publish agency Priorities in the *Federal Register*, which must be used to select the Priorities for a competition and must have gone through public comment, unless one of the following exceptions apply:

(i) The final annual priorities will be implemented only by inviting applications that meet the priorities;

(ii) The final annual priorities are chosen from a list of priorities already established in the program's regulations;

(iii) Publishing proposed annual priorities would seriously interfere with an orderly, responsible grant award process or would otherwise be impracticable, unnecessary, or contrary to the public interest;

(iv) The program statute requires or authorizes the Secretary to establish specified priorities; or

(v) The annual priorities are chosen from allowable activities specified in the program statute.

34 C.F.R. § 75.105(b)(2); 20 USC § 1232(d).

22.     The Secretary is likewise required to establish the specific Priorities that are included in the application for each competitive federal grant program, such as TQP, SEED, and TSL, by publishing the Priorities in the Notice Inviting Applications for the grant in the *Federal Register*. (34 C.F.R. § 75.105(b)(1)).

23.     As a federal agency, the Department is unique in the statutory requirement it has to follow for setting agency Priorities for discretionary grants. While the APA (5 U.S.C. § 553) exempts grants from the rulemaking process, the General Education Provisions Act (20 U.S.C. § 1232(d)) ("GEPA") states that, for the Department of Education, the grants exemption for rulemaking only applies to regulations (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines rulemaking will cause extreme hardship to the intended beneficiaries of the program.

24.     In other words, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process, unless one of the above exceptions apply.

## II.    Department of Education Priorities Applicable to the Now-Terminated TQP, SEED, and TSL Grants.

25.     After going through the proper notice and comment rulemaking process, the Department published a Notice of Final Priority for discretionary grant programs in the *Federal Register* on November 27, 2019. (84 F.R. 65300-65303).[5] Also after following the required notice and comment rulemaking process, the Department published a Notice of Final Priorities for all discretionary grant programs in the *Federal Register* on March 9, 2020.[6] (85 F.R. 13640-13644).

---

[5] The Department of Education published a Notice of Proposed Priorities for public comment on July 29, 2019. (84 F.R. 36504-36507).

[6] The Department of Education published a Notice of Proposed Priorities for public comment on November 29, 2019. (84 F.R. 65734-65739).

26.     Then, after going through the proper notice and comment rulemaking process, the Department published its Notice of Final Priorities for TQP, SEED, and TSL grant competitions in the *Federal Register* on July 9, 2021.[7] The final Priorities consisted of: Priority 1—Supporting Educators and Their Professional Growth; and Priority 2—Increasing Educator Diversity. (86 F.R. 36217-36220).

27.     On July 9, 2021, after going through the proper notice and comment rulemaking process, the Department published a Notice of Final Priority for TSL.[8] The Priority was for "High-Need Schools." (86 F.R. 36220-36222).

28.     After following the required notice and comment rulemaking process, the Department of Education published a Notice of Final Priorities for the Secretary's Supplemental Priorities for all discretionary grant programs in the *Federal Register* on December 10, 2021.[9] The final supplemental Priorities consisted of the following: Priority 1—Addressing the Impact of COVID-19 on Students, Educators, and Faculty; Priority 2—Promoting Equity in Student Access to Educational Resources and Opportunities; Priority 3—Supporting a Diverse Educator Workforce and Professional Growth To Strengthen Student Learning; Priority 4—Meeting Student Social, Emotional, and Academic Needs; Priority 5—Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success; and Priority 6—Strengthening Cross-Agency Coordination and Community Engagement To Advance Systemic Change. (86 F.R. 70612-70641).

---

[7] The Department of Education published a Notice of Proposed Priorities for public comment on April 20, 2021. (86 F.R. 20471-20475).

[8] The Department of Education published a Notice of Proposed Priority for public comment on April 9, 2021. (86 F.R. 18519-18523).

[9] The Department of Education published a Notice of Proposed Priorities for public comment on June 30, 2021. (86 F.R. 34664-34674).

III.    **Notice Inviting Applications for FY 2020, FY 2022, and FY 2024 TQP Grants.**

29.    On May 18, 2020, the Department published a Notice Inviting Applications for the FY 2020 TQP competition inviting applicants to apply for the grant funds. (85 F.R. 29691-29704). In addition, on February 25, 2022, the Department published a Notice Inviting Applications for the FY 2022 TQP competition inviting applicants to apply for the grant funds. (87 F.R. 10906-10923). The Department similarly published a Notice Inviting Applications for the FY 2024 TQP competition on April 4, 2024. (89 F.R. 23573-23592).

30.    The project period for the FY 2020, FY 2022, and FY 2024 TQP competitions (the maximum amount of time for which the grants can be awarded) was up to five years. (85 F.R. 29699, 87 F.R. 10918, 89 F.R. 23587).

31.    All three TQP grant competitions included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TQP's authorizing statute (20 U.S.C. § 1022).

32.    Grant Recipients were selected to receive funding from the FY 2020 TQP competition for up to a five-year period.

33.    Grant Recipients were selected to receive funding from the FY 2022 TQP competition for up to a five-year period.

34.    Grant Recipients were selected to receive funding from the FY 2024 TQP competition for up to a five-year period.

IV.    **Notice Inviting Applications for FY 2022 SEED Grants.**

35.    On April 4, 2022, the Department published a Notice Inviting Applications for the FY 2022 SEED competition, inviting applicants to apply for the grant funds. (87 F.R. 19487-19496).

36.     The project period for the FY 2022 SEED competition was up to three years. (87 F.R. 19492).

37.     The SEED grant competition included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in SEED's authorizing statute (20 U.S.C. § 6672).

38.     Grant Recipients were selected to receive funding from the FY 2022 SEED competition for up to a three-year period.

**V.      Notice Inviting Applications for FY 2023 TSL Grants.**

39.      On May 24, 2023, the Department published a Notice Inviting Applications for the FY 2023 TSL competition, inviting applicants to apply for the grant funds. (88 F.R. 33592-33601).

40.     The project period for the FY 2023 TSL competition was up to three years. (88 F.R. 33598).

41.     The TSL grant competition included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TSL's authorizing statute (20 U.S.C. § 6632).

42.     Grant Recipients were selected to receive funding from the FY 2023 TSL competition for up to a three-year period.

**VI.     The Department's Decision to Terminate the TQP, SEED, and TSL Grants.**

43.     In February 2025, the Department sent Termination Letters and updated Grant Award Notifications to Grant Recipients, informing them that their TQP, SEED, and TSL grants were terminated. The termination of the grants was effective "in [their] entirety" immediately. *See* Exhibits A, B.

44.     The only stated reason for the termination of the grants was that they are "inconsistent with, and no longer effectuate[], the Department priorities." *See id*.

VII.    **The Preliminary Injunction Granted in *NADOHE et al. v. Trump et al.* Prohibits the Department from Enforcing the Termination of the Grants.**

45.    On February 21, 2025, this Court granted a preliminary injunction blocking the President's administration from enforcing certain provisions of Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive Order of January 20, 2025, 90 Fed. Reg. 8339 (Jan. 29, 2025) (the "J20 Order"), and Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("J21 Order"). *National Association of Diversity Officers in Higher Education, et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) (the "NADOHE Order"). A true and correct copy of the NADOHE Order is attached as **Exhibit C**.

46.    In relevant part, the NADOHE Order enjoins the President's administration from enforcing a provision in Executive Order 14151 requiring "[e]ach agency, department, . . . [to] take the following actions within sixty days of this order: (i) terminate, to the maximum extent allowed by law, . . . all . . . 'equity-related' grants or contracts" (the "Termination Provision").

47.    In granting the preliminary injunction, the Court held that the plaintiffs showed a likelihood of success on their claim that the Termination Provision is void for vagueness under the Fifth Amendment.

48.    While the Grant Award Notification and Termination Letters did not reference Executive Order 14151 as the reason for terminating the grants, the Department released a press release on February 17, 2025 that makes clear that the grant terminations at issue in this lawsuit were pursuant to the Termination Provision in Executive Order 14151 requiring the Department to terminate "equity-related" grants or contracts. A true and correct copy of the press release is

attached as **Exhibit D**.[10] The press release explains that the grants were terminated because they were using taxpayer funds to train teachers and education agencies on divisive ideologies, such as "Diversity, Equity, and Inclusion" and "equity training"– the same directive of the Termination Provision. *See id*.

49.    The Termination Letters likewise reference the Department's position to "ensure[] that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives[.]" (Exhibit B at pages 1, 3, 5, 7, 9, 11, 13).

50.    While the Grant Award Notifications and Termination Letters state that the grants were terminated because they were "inconsistent with, and no longer effectuate[], Department priorities," it is clear from the Government's conduct that the grants were terminated pursuant to the now-enjoined Termination Provision.

51.    The NADOHE Order benefits not just the named plaintiffs in that action, but all contractors and grantees who were subjected to the Termination Provision. *NADOHE v. Trump,* No. 1:25-CV-00333-ABA, 2025 WL 573764 at *28-29.

52.    As such, this Court's NADOHE Order covers, and forbids, the continued enforcement of the termination of the grants at issue in this lawsuit. Plaintiffs seek relief directing the Department to return the Grant Awardees to the *status quo ante* with respect to Executive Order 14151 and rescind the termination of their TQP, SEED, and TSL grants.

---

[10]    *See*    https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

VIII.    **The Department's Termination of the Grants also Violates the Administrative Procedures Act ("APA").**

53.    Even if the Department's termination of the grants at issue in this lawsuit were not governed by the NADOHE Order, the terminations were unlawful because they constituted an unlawful, arbitrary, and capricious action that violates the APA.

54.    Statute and regulation require the Secretary to publish Department Priorities for program grants in the *Federal Register*, subject to a notice and comment period. (20 U.S.C. § 1232(d), 34 C.F.R. § 75.105(b)(2)). The Secretary then selects allowable Priorities to include in the applications which are published in the *Federal Register*. (34 C.F.R. § 75.105(c)).

55.    The proffered reason by the Department for the termination of the grants because they "are inconsistent with, and no longer effectuates, Department priorities," is contrary to statute and regulation and arbitrary and capricious.

56.    The Department cannot, by law, determine that with a change in administration, specific Department Priorities for grant programs are no longer allowable unless and until the Department engages in rulemaking to propose and issue new Final Priorities. The present administration has not done that, so the current Priorities remain Department Priorities.

57.    The Department Priorities for the grants that were awarded from the respective competitions were lawfully selected for, and articulated in, the published Notices Inviting Applications in 2020, 2022, 2023 and 2024 pursuant to program statutes or after the proper notice and comment rulemaking process.

58.    As a result, and contrary to the Department's official reasons, the grants at issue are consistent with the current Department Priorities. If the Department wishes to establish new Department Priorities, it may do so only through the means established by statute and regulation, not through whim or fiat.

IX.    **Effect of Termination on Plaintiffs and Their Member Organizations.**

59.    As of the date of the Termination Letters, all funding from the grants has been halted and the Grant Recipients are no longer receiving any funds from the Department under the grants they were awarded under TQP, SEED, and TSL.

60.    Without the TQP, SEED, and TSL grants, Grant Recipients are unable to continue funding their work.

61.    The loss of funding is an economic harm so great that it threatens the very existence of Plaintiffs' members' teacher preparation programs.

62.    The TQP, SEED, and TSL grants together fund hundreds of teacher preparation programs in the United States, and the termination *en masse* of these grants threatens the system that prepares our nation's teaching workforce.

63.    The harm to Plaintiffs and their member organizations from the terminations has been severe, and a continuation of the harm is certain and irreparable.

64.    The following represent just a few of many examples of the harm to Plaintiffs and their member organizations caused by the Department's termination of the Grant Recipients' TQP, SEED, and TSL grants:

### A.  Plaintiff NCTR

65.    Plaintiff NCTR has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. Plaintiff NCTR was awarded a three-year SEED grant in 2022.

66.    NCTR's SEED grant funded thirteen teacher residency programs spanning five states. The teacher residency programs consist of partnerships between higher education

institutions and K-12 school districts in traditional public and charter schools located in rural, suburban, and urban areas.

67.    The teacher residency programs provide financial support to their participants in the following ways: tuition support, living expense stipends, tutoring in licensing examinations, and emergency funds. The programs also provide mentorship, intensive training and professional development, and summer institutes for mentor teachers.

68.    Plaintiff NCTR's SEED grant is also used to fund a cross-organizational (twelve residency programs) collaborative effort to create and field-test a coherent and aligned vision of mentoring excellence and collective responsibility. One of the goals of the grant funds was to complete a study of attainable metrics to evaluate mentor teacher impacts on resident learning.

69.    Plaintiff NCTR's SEED grant was terminated in its third year.

70.    The termination of the SEED grant will result in a $1,188,070 overall loss, including a $332,000 direct loss to the grant winning organization, as well as a loss of $360,000 in expenses to contractors and a $495,000 loss in subgrants to the thirteen teacher residency programs.

71.    This $495,000 loss in subgrants will have an adverse impact on the thirteen teacher residency programs, and will directly lead to staff cuts at a number of those institutions. In addition, the grant termination directly affects the 128 teacher residents currently enrolled in the thirteen programs as part of the 2024-25 school year and will also impact the ability of those thirteen programs to enroll the projected 190 teacher residents who plan to begin their residency year this summer 2025. With the termination of the grant, some of the thirteen teacher residency programs will be forced to close.

72.    Programs intended to use subgrant funds to provide tuition relief and stipends for both groups of teacher residents, which would total over 300 teacher residents. This will no longer be possible with the termination of the grant.

73.    The termination of the grant will also directly affect at least 7,500 K-12 students across the five states.

74.    In addition, with the grant's termination, the study of the mentor teacher impact and teacher resident learning will not be completed, depriving Plaintiff NCTR of its capacity to engage in core mission-driven activities, such as publishing about the most promising practices for developing skilled, experienced teachers into impactful mentors of new teacher residents.

75.    Furthermore, without its ability to continue these thirteen teacher residency programs due to the loss of grant funding, Plaintiff NCTR is deprived of its ability to serve the K-12 school districts where there is high turnover and shortages of teachers and prepare educators for careers to help mitigate these teacher shortages.

76.    These harms prevent NCTR from engaging in the core activities compelled by its mission and reason for existence.

### B. AACTE Member Organization - American University

77.    American University ("AU") is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. AU is in the second year of a five-year TQP grant.

78.    AU's TQP grant funds a teacher preparation program for special education (learning disabilities) and early childhood education, the Residency for Excellence in Teaching and Learning ("RETL").

79.    RETL is a partnership between AU's School of Education and its charter network, Washington D.C. Friendship Public Charter Schools, consisting of five charter campuses. The purpose of the partnership is to provide a pathway for educator development to address critical areas of need, including early childhood education and special education,[11] and recruit highly motivated preservice teacher candidates who are committed to teaching in diverse early childhood and special education settings (pre-K through grade five).

80.    The partnership enables participants to complete a residency-based master's degree with an initial teaching license in Early Childhood Education or Special Education - Learning Disabilities. In addition to earning their Masters of Arts in Teaching degree, program participants receive comprehensive coaching, professional development, and ongoing support during the entirety of the three-year program -the residency year (the first year) and the induction years (the second and third year).

81.    RETL supports pathways in high-need teaching areas of early childhood education and special education, specifically targeting urban and underserved geographic areas with their partner charter network. RETL services five Friendship Public Charter campuses.

82.    RETL provides a living stipend to participants and reduced tuition (by roughly 35% of the AU graduate tuition rate) to one of two AU's School of Education's Master of Arts in Teaching degrees, Special Education in Learning Disabilities and Early Childhood Education.

83.    AU was in its second year of RETL when the Department terminated the grant, with eight students who are expected to graduate from AU in December 2025. With the funding from the TQP grant, AU planned to recruit an additional forty participants. As a result of the loss

---

[11] Washington D.C. is in need of educators for special education to serve students with disabilities. *See* https://specialedcoop.org/news-articles/the-state-of-special-education-in-the-district-of-columbia/, https://www.washingtonpost.com/opinions/2022/10/27/dc-students-disabilities-urgent-reform/.

of funding from the terminated TQP grant, AU will no longer be able to recruit future cohorts. As a result, forty-eight future RETL participants who would have had the opportunity to earn a Master of Arts in Teaching degree and deepen their expertise and longevity as teachers in Washington D.C. will no longer have that opportunity.

84.     The termination of the TQP grant will halt AU's efforts to remedy dramatic teacher shortages and improve outcomes for early childhood and special education students in Washington D.C. Up to 1,500 Washington D.C. students will be impacted by the termination of the grant, in addition to the educators at the charter school partners.

85.     In addition, AU planned to expand to at least two additional charter schools in the remaining years of the TQP grant. As a result of the Department's termination of AU's grant, there is no opportunity for additional students and educators to be served.

86.     The termination of the TQP grant will also result in AU terminating the employment of its full-time coach/program director.

87.     If funding through the TQP grant is not reinstated, the RETL program will be forced to close.

88.     These harms prevent AU/RETL from engaging in the core activities compelled by their missions and reason for existence.

### C.  AACTE Member Organization – University of St. Thomas

89.     The University of St. Thomas ("UST") is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. UST is in the second year of a three-year SEED grant and the fifth year of a five-year TQP grant.

90.    The UST SEED grant funds three pathway models to a career in education: (1) a residency program for graduate students in partnership with St. Paul Public Schools, Minneapolis Public Schools, and a consortium of charter schools; (2) a "work and learn" program for graduate students in partnership with schools throughout the state of Minnesota where paraprofessionals and teachers are employed while completing their teacher preparation program; and (3) an undergraduate program which prepares undergraduate students for educational careers in their junior and senior years at UST.

91.    The SEED grant provides funds of up to $20,000 per year for graduate students and up to $40,000 per year to undergraduate students who are pursuing teacher licensure in special education and elementary education.

92.    UST is currently in year two of the three year SEED grant. In year two, the grant was set to fund over 300 scholarships to future educators over the three year grant period, most of whom were preparing to be special education teachers, for approximately $2,000,000. Scholarships for fall and spring semester were disbursed to students prior to the grant termination. However, without access to the SEED grant funds, UST can no longer provide summer funding to the majority of these future educators. As a result, many of the future educators may not be able to afford the schooling required to continue their path to becoming teachers.

93.    Year three of the SEED grant was set to fund scholarships in the amount of $2,200,000; termination of the grants will result in a loss of all of these scholarships. In addition, termination of the SEED grants will result in a loss of funding for mentor teachers for professional development.

94.    To date, nearly 80 communities across the state of Minnesota have been taught by teachers who received SEED scholarship funds, including schools in rural, urban, suburban, and

exurban communities. Without continued SEED funding, the teacher pipeline program at UST will graduate fewer students capable of serving in high-needs areas such as special education, which will have widespread negative impacts on the many communities, teachers and students these teacher pipeline programs benefit.

95.    UST's TQP grant removes financial barriers to careers in education by providing funding for UST to partner with charter schools to provide living wage stipends to student teaching residents preparing to become licensed educators. UST is in year five of this TQP grant, and at present, 21 student teaching residents are in the middle of their second semester of student teaching. Collectively, the student teaching residents were set to receive $819,000 for stipends (the first half of which has already been paid), however, the termination of the TQP grant will put the living-expense stipends for these students at risk.

96.    These harms interfere with UST's ability to serve its students, and through them, to serve the community and fulfill its mission to advance the common good.

### D.  NCTR and AACTE Member Organization – Alder Graduate School of Education

97.    Alder Graduate School of Education ("Alder GSE") is a member organization of Plaintiff NCTR and Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. Alder GSE was awarded a five-year TQP grant in 2020, as well as a five-year TQP grant in 2022.

98.    Both of Alder GSE's TQP grants fund teacher residency programs.

99.    The teacher residency programs consist of partnerships between Alder GSE and partner K-12 school systems, including public school districts and a Special Education Planning Area, to operate community-based workforce development pathways for aspiring teachers.

100.    Alder GSE and its partner K-12 school systems recruit and prepare community members through a one-year teacher residency program, where candidates co-teach with a highly qualified mentor teacher while earning their Master's degree and teaching credential. They are often hired immediately upon completion of the program, most often by the school systems where they trained.

101.    The 2020 TQP grant's goals are: (i) launch and scale a new and sustainable residency program with three partner local education agency that meets local human capital needs; (ii) train, support and retain effective new teachers in schools with high concentrations of high need students; and (iii) demonstrate the capacity of partners to scale, sustain, and replicate teacher residency and development model. The 2022 TQP grant's goals are: (i) build a pipeline of high-quality and diverse teachers in partnership with high-need local education agencies that effectively meets their human capital needs and certification shortage areas; (ii) promote equity, strengthen student learning, and meet the social, emotional, and academic needs of students by modeling for and by building the capacity of mentors and residents to use evidence based practices and to create positive and inclusive learning environments; and (iii) increase impact by building capacity, sustainability and scale of the partnership and high-leverage strategies.

102.    The termination of the grants has had and will continue to have immense impacts on the aspiring teacher candidates, mentor teachers, the partner K-12 school systems, and Alder GSE.

103.    For the 2024-2025 academic year, the teacher residency programs have 83 aspiring teacher candidates who were receiving a living stipend supplemented by the funds from the TQP grants. The teaching candidates depend on these stipends to live, eat, and support their families – for most they are their only source of income. The teaching candidates signed Letters of

Commitment before June 2024, with the expectation of a level of stipend for the entirety of the school year. The teacher residency programs also presently have 83 mentor teachers who receive a stipend funded by grant funds for their work in support of their efforts to train and develop new teachers. With the termination of the grants, the 83 aspiring teacher candidates and 83 mentor teachers will no longer receive the level of stipends they were promised.

104.    Alder GSE has already recruited 40 new teacher candidates for the 2025-2026 academic year and K-12 school systems had planned to provide the living stipends – the majority of which were planned to be supplemented with TQP grant funds. Alder GSE recruited the majority of these residents with the expectation of a level of funding for their living stipend that was supplemented by the grant funding. The majority of these residents are enrolled, have signed letters of commitment, or are in final rounds of interviews/admissions. The financial impact of the grants' termination will affect many of their decisions to become teachers. Similarly, the grants' termination affects the stipend funding levels for mentors, which will have an impact on their decision to continue with the role.

105.    Alder GSE similarly planned to recruit 40 new teacher candidates and 40 new mentors for the 2026-2027 academic year, however, with the loss in grant funds, it will be more difficult for Alder GSE to recruit and prepare these future prospective candidates.

106.    The termination of the 2020 and 2022 TQP grants has caused and will continue to cause harm to the partner K-12 school systems as well. They are at risk of losing the teacher candidates who taught in their schools, which will have a negative impact on the school and its community. Alder GSE expects about $2.1 million of lost funding for their partner K-12 school systems.

107.    There were also a number of programmatic roles at Alder GSE that were partially supported by these TQP grants. These roles were supporting operation of these partnerships and these residency programs - including recruitment, admissions, enrollment, student services, financial support, data and impact, academic programs, and clinical programs. Alder GSE expects about $2.2 million of lost funding supporting Alder GSE costs to support these partnerships and residency programs.

108.    Additionally, the terminations will cause Alder GSE to lose approximately $600,000 in funding for evaluation contracts. Alder GSE's evaluation partner was providing an important source of formative feedback and evidence of program effectiveness. The evaluation from TQP 2020 has a retention study in progress that is six months to completion, but will likely not be completed as a result of the termination of the grant. The evaluation for TQP 2022 still had 2.5 more years of data collection that has been terminated mid-cycle.

109.    In addition to the dollars lost, the time and resource demands to meet this sudden news has been extraordinary. There have been countless hours of work to communicate clearly to all affected parties and to work with Alder GSE's Board and team on determining ways to mitigate these significant and completely unexpected losses.

110.    These harms prevent Alder GSE from engaging in the core activities compelled by its mission and reason for existence.

### E.  AACTE Member Organization – Teaching Lab

111.    Teaching Lab is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. In 2023, Teaching Lab was awarded a three-year TSL grant.

112.    Teaching Lab's TSL grant funds Project Refine, Innovate, Share, and Elevate ("Project RISE"). Project RISE involves the following: (i) implementation of Teaching Lab's teacher leadership and coaching model for public K-12 school systems located in Milwaukee, Wisconsin, Kemper, Mississippi, El Paso, Texas, and Osceola, Arkansas (the "Public School Beneficiaries"); (ii) development of human capital management systems in the foregoing districts; and (iii) a rigorous, randomized controlled trial on Teaching Lab's teacher development and coaching model, to be conducted in partnership with the American Institutes for Research, focused on the work in Milwaukee.

113.    Across all of the Public School Beneficiaries, Teaching Lab's programs through the TSL grant impact more than 40 schools and more than 150 teachers, whose instruction in turn reaches well over 6,000 K-12 students.

114.    Teaching Lab's TSL grant was terminated by the Department, resulting in great uncertainty regarding the future of Project Rise. Absent the grant funding, Teaching Lab will no longer be able to provide the curriculum-based professional learning and coaching services through Project RISE to the Public School Beneficiaries. At this time, Teaching Lab does not have an alternate source of funding. The Public School Beneficiaries do not have room in their budget to unexpectedly pay for the services.

115.    Teaching Lab has hired more than two dozen employees and contractors to support Project RISE. If the TSL grant funding is suspended for any amount of time, Teaching Lab will likely have to furlough or layoff many or all of these workers.

116.    The termination of the grant also puts the American Institutes for Research study evaluating how school districts can best spend their limited funds and limited teacher development time and resources at risk. Teaching Lab is not able to fund the study without the TSL grant funds.

117.    In addition to the loss of the study, the Public School Beneficiaries and the public will be significantly harmed by the termination of the grant, as one or more of the Public School Beneficiaries is likely to lose the benefit of Teaching Lab's services. Specifically, the Public School Beneficiaries stand to lose value of up to roughly $7 million in services if the termination moves forward.

118.    These harms prevent Project RISE from engaging in the core activities compelled by its mission and reason for existence.

### F. AACTE Member Organization – University A[12]

119.    University A is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. In 2022, University A was awarded a five-year TQP grant.

120.    University A's TQP grant funds Program A, a program that supports talented rural individuals to receive an undergraduate degree and license without leaving their hometown. Candidates can receive a Bachelor of Arts degree and a teaching license in early childhood education, elementary education, special education, middle school math education, and secondary science education. University A partners with rural community colleges employing many rural educators.

121.    Program A was created to address the extreme teacher shortage in rural State A. Pre-K through year 12 students can go years without a qualified teacher, forcing rural districts to hire people without degrees or experience and negatively impacting rural students' learning.

---

[12] University A is an AACTE member organization that is fearful of retaliation, and therefore, did not wish to disclose its name in this Complaint or provide a Declaration that identified it by name. However, it wanted to share the severe and devastating impact the Department's termination of its TQP grant has caused and will continue to cause, absent Court intervention. This Complaint refers to the member organization as "University A" in State A, and its teacher preparation program as "Program A."

122.    Program A's TQP grant has an immensely positive economic impact on rural communities in State A. Specifically, the program funded by the grant serves 57 rural State A school districts in partnership with four rural community colleges. These districts stretch across State A representing some of the most financially impoverished communities in State A, and have some of the highest teacher shortage areas in the state. Program A was able to provide teachers for more than 2,500 students in pre-K through year 12 each year.

123.    Program A graduated 49 teachers who are presently teaching in State A rural schools. Currently, there are 77 students supported through the grant, as well as eight recent graduates supported within required induction supports.

124.    The termination of the grant forced University A to terminate the employment of the instructors who teach the courses, and eliminated the infrastructure and human resources that support Program A. University A anticipated preparing 146 teachers by the end of the five-year grant in 2027 and anticipated supporting these new teachers in their beginning years of teaching. The termination of the grant will result in a loss of 69 new teachers for these hard-hit rural areas.

125.    Furthermore, there was a total of 11 full-time equivalent positions in both rural communities and in State A's major city funded through the grant, however with the grant's termination, the money supporting rural grant employee salaries was lost immediately; State A's community college partners are uncertain about the ability to utilize emergency institutional funds to continue them, even short term. University A is using emergency funding to support State A grant employees until the end of the Spring 2025 semester, however, after the end of the semester, all of the rural grant employees will be forced to be let go.

126.    With the grant's termination, Program A will no longer be able to continue, which will have significant consequences on University A and its community as well as the rural communities it serves.

127.    These harms prevent Program A from engaging in the core activities compelled by its mission and reason for existence.

## X.    Defendants' Actions Will Cause Plaintiffs and Their Member Organizations Immediate and Irreparable Harm.

128.    Defendants' actions have harmed Plaintiffs and their member organizations by unlawfully depriving them of funding, which without Court intervention, will continue to cause immediate and irreparable harm.

129.    The funding was also used towards tuition support for enrollment at many of the colleges and universities. Without this ability of the Grant Recipients to address significant financial barriers for students, many will no longer be able to afford to continue to pursue a career in teaching and the programs' attendance will plummet.

130.    Due to the lack of funding for these programs, the Grant Recipients presently have, and will continue to have, a more difficult time recruiting new students. The tuition and other financial supports provided by the grants was used as a recruitment tool by the Grant Recipients. Without these tools to make it more affordable for cohorts of future teachers to pursue education careers, enrollment will decline, and significant structural changes will have to be made to address that decline, including changes that it may take years to repair, such as loss of staff and infrastructure that cannot be easily re-scaled.

131.    The termination of grants will jeopardize the pipeline of high-quality educators entering into schools nationwide. The forced closure of the teacher preparation programs as a result

of the lack of funding results in losing talented candidates who are ready and eager to serve students, particularly in high-need areas like special education.

132.    The loss of funding will not only significantly reduce the Grant Recipients' ability to address the ongoing teacher shortage, but also exacerbate the teacher shortages, especially in rural and urban communities, across the country.

133.    Without the grant funding, the Grant Recipients will no longer be able to provide targeted resources and training, peer support networks, professional development, and mentorship that are critical to teachers' success in the classroom.

134.    The termination of the grants is also resulting in, and will continue to result in, loss of employment for the dedicated staff members and grant managers who worked to make the teacher preparation programs run.

135.    The harm suffered by Plaintiffs is actual, not theoretical, as the funding was terminated in February 2025, immediately resulting in the Grant Recipients' inability to continue their programs, particularly given that the terminations occurred in the middle of the academic year.

136.    The loss of the funding will frustrate the Grant Recipients' abilities to fulfil their mission of providing programs to offer supports to improve the quality of teaching and school leadership.

137.    The Termination Letters provide that the Grant Recipients may challenge the termination decision by submitting information documenting their position in writing to the Department within thirty days of the termination. *See* Exhibit B at pages 2, 4, 6, 8, 10, 12, 14.

138.    However, any appeal to the Department does not alter the fact that the termination of funding was effective on the date of notification in February 2025. There is no funding provided starting the date of termination pending any appeals.

139.    There is no timeframe by which the Department is obliged to make a determination regarding an appeal. Therefore, even if the Grant Recipients appeal the termination decision, the timeframe in which a determination would be made is unknown. While any appeals are pending, the Grant Recipients will continue to be deprived of funding.

140.    Absent Court intervention, regardless of whether the Grant Recipients submit an appeal to the Department, many Grant Recipients will be forced to shut down their programs as a result of Defendants' unlawful actions, resulting in great harm.

## XI.    Plaintiffs were Further Harmed by Defendants' Unlawfully Imposed Grant Conditions.

141.    Generally, unless a grantee poses a specific risk, they can draw down funds from their grant award based on the allowable, allocable and reasonable costs approved in their grant budget without prior approval.

142.    In addition to the unlawful actions concerning terminating the grants discussed above, the Department also added a special condition to impacted grants after they were terminated requiring prior approval for them to draw down funds. This special condition is referred to as "route pay."

143.    The grantees are eligible for costs that were properly incurred before their termination date and costs that would not have occurred if the grant was not terminated. They have 120 days to draw down the funds after the termination date. (2 C.F.R. §§ 200.343, 200.472, 200.344(b)).

144.    The regulations that govern federal grants set the reasons that the Department can put conditions on grants and the requirements for notice prior to doing so. Imposing a special condition, such as establishing additional prior approvals, on a grant can only be done if the grantee is determined to pose a risk. Factors that may be considered are financial stability, quality of management systems and standards, history of performance, audit reports and filings, ability to effectively implement requirements, history of compliance with conditions of a federal award, or a responsibility determination. (2 C.F.R. § 200.208).

145.    The rule also states that before conditions are put in place, the agency has to notify the grantee as to: (1) The nature of the additional requirements; (2) The reason why the additional requirements are being imposed; (3) The nature of the action needed to remove the additional requirement, if applicable; (4) The time allowed for completing the actions if applicable; and (5) The method for requesting reconsideration of the additional requirements imposed. (*Id.*).

146.    Without notice or any finding of individual grantee risk, the Department put a blanket condition on the terminated grants to require prior approval for all drawdowns.

147.    This new, unlawfully-imposed condition will cause delays in the Grant Recipients receiving their grant funds and add potential subjectivity to already approved costs.

148.    Therefore, placing the grants on route pay was unlawful.

## FIRST CAUSE OF ACTION

### (Fifth Amendment Due Process (Vagueness))

149.    All preceding paragraphs of this Complaint are incorporated as if fully set forth herein.

150.    Under the Fifth Amendment to the United States Constitution, a governmental enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of

ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

151.    The Termination Provision of Executive Order 14151 "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

152.    Executive Order 14151 does not define key terms, including "DEI," "DEIA," "equity" or "equity-related" and fails to satisfy the constitutional minimum.

153.    This Court previously granted a preliminary injunction enjoining the President's administration from terminating any awards on the basis of the Termination Provision in the NADOHE Order.

154.    The NADOHE Order applies to not just the named plaintiffs in that action, but to **all** contractors and grantees who were subjected to the Termination Provision.

155.    Plaintiffs and their member organizations were subjected to the Termination Provision when the Department terminated the grants at issue in this lawsuit under the instructions provided in Executive Order 14151.

156.    It follows, therefore, that Plaintiffs should also be returned to the *status quo ante* – their status prior to the Department subjecting them to the unlawful Termination Provision when it terminated their grants – just as the NADOHE Order intended.

## SECOND CAUSE OF ACTION

### (Violation of APA – Arbitrary and Capricious Decision)

157.    All preceding paragraphs of this Complaint are incorporated as if fully set forth herein.

158.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or are made] without observance of procedure required by law[.]" (5 U.S.C. § 706(2)).

159.    Defendants' termination of the Grant Recipients' grants constitutes final agency action under the APA. The Termination Letters provide that the "Department hereby terminates grant No. [] in its entirety effective 2/[]/25," marking it the consummation of the Department's decision-making process and demanding immediate compliance with the announced position. As of the date of the Termination Letters, the Department stopped providing all funding approved by the grants, thereby having a direct and immediate effect on Plaintiffs and their member organizations.

160.    Defendants' decision to terminate the grants is unlawful, arbitrary, and capricious for the reasons set forth above.

WHEREFORE, Plaintiffs pray that this Court:

(A)    Declare Defendants' termination of the TQP, SEED, and TSL grants unlawful;

(B)    Declare Defendants' actions placing TQP, SEED, and TSL grants on route pay unlawful;

(C)    Enter a preliminary injunction or temporary restraining order (a) enjoining Defendants' enforcement of the termination of the TQP, SEED, and TSL grants; (b) ordering such grant funding reinstated forthwith; (c) ordering Defendants to provide the Grant Recipients reimbursement for all otherwise allowable expenditures incurred between the date of termination and the Court's order; (d) enjoining Defendants' termination of any additional TQP, SEED, and TSL grants if such termination would be inconsistent with the Court's order; and (e) removing the route pay grant conditions from TQP, SEED, and TSL grants;

38

(D)    Issue a permanent injunction providing the same relief;

(E)    Award Plaintiffs their costs and reasonable attorneys' fees; and

(F)    Grant such other relief as this Court may deem just and proper.

Dated: March 3, 2025                              Respectfully Submitted,

                                                 */s/ Daniel M. Moore*
                                                 Daniel M. Moore (Bar No. 21834)
                                                 SAUL EWING LLP
                                                 1001 Fleet Street, Ninth Floor
                                                 Baltimore, Maryland 21202-4359
                                                 Telephone: (410) 332-8734
                                                 Facsimile: (410) 332-8862
                                                 daniel.moore@saul.com

                                                 Joshua W.B. Richards (*Pro Hac Vice Forthcoming*)
                                                 Carolyn M. Toll (*Pro Hac Vice Forthcoming*)
                                                 SAUL EWING LLP
                                                 1500 Market Street, 38th Floor
                                                 Philadelphia, Pennsylvania 19102
                                                 Tel: (215) 972-7737
                                                 joshua.richards@saul.com
                                                 carolyn.toll@saul.com

                                                 *Counsel for Plaintiffs*