# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

AMERICAN ASSOCIATION OF
COLLEGES FOR TEACHER
EDUCATION, *et al.,*

        *Plaintiffs,*

   v.

DENISE CARTER, *et al.,*

        *Defendants.*

Civil Action No. 25-cv-00702

## PLAINTIFFS AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, NATIONAL CENTER FOR TEACHER RESIDENCIES, AND MARYLAND ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR <u>TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION</u>

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................ 4

    A.   OVERVIEW OF TQP, SEED, AND TSL GRANTS AND DEPARTMENT PRIORITIES. ................. 4
       1.   *Congress Created and Funded the TQP, SEED, and TSL Grants.* ................................ 4
       2.   *Regulations Governing Grant Terminations.* ............................................................. 4
       3.   *Statute and Department Regulation Requirements for Setting Priorities.* ................... 5
       4.   *Department of Education Priorities Applicable to Now-Terminated TQP, SEED, and TSL Grants.* ................................................................................................................ 6

    B.   AACTE'S AND MACTE'S MEMBER ORGANIZATIONS AND NCTR AND ITS MEMBER ORGANIZATIONS WERE AWARDED TQP, SEED, AND/OR TSL GRANTS. ................................. 7
       1.   *Notice Inviting Applications for FY 2020, FY 2022, and FY 2024 TQP Grants.* ........... 7
       2.   *Notice Inviting Applications for FY 2022 SEED Grants.* ............................................. 8
       3.   *Notice Inviting Applications for FY 2023 TSL Grants.* ............................................... 8

    C.   THE DEPARTMENT'S TERMINATION OF THE TQP, SEED, AND TSL GRANTS IN FEBRUARY 2025 ................................................................................................................................. 9

    D.   THIS COURT'S ORDER GRANTING PRELIMINARY INJUNCTION IN *NADOHE ET AL. V. TRUMP ET AL.* ............................................................................................................................. 10

    E.   THE EFFECTS OF TERMINATION ON PLAINTIFFS AND THEIR MEMBER ORGANIZATIONS. .... 11
       1.   *Effect of Grant Termination on Ability to Maintain Programs.* ................................. 11
       2.   *Effect of Special Condition on Grants.* ..................................................................... 13

III.    LEGAL STANDARD ...................................................................................... 13

IV.     ARGUMENT .................................................................................................. 14

    A.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .................................................. 14
       1.   *Plaintiffs are Likely To Succeed on their Fifth Amendment Due Process (Vagueness) Claim.* ........................................................................................................................ 15
       2.   *The Department's Termination of the TQP, SEED, and TSL Grants Violates the Administrative Procedures Act (Count II).* ................................................................. 18

    B.   IN THE ABSENCE OF AN INJUNCTION, PLAINTIFFS ARE CERTAIN TO SUFFER IRREPARABLE HARM. ...................................................................................................................................... 23
       1.   *Certain and Irreparable Harm to Plaintiffs and Their Member Organizations.* .......... 25
       2.   *Harm Resulting from Defendants' Unlawfully Imposed Grant Conditions.* ................. 28
    C.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF. .............. 30
    D.   NO BOND IS NECESSARY. .............................................................................................. 31

V.      CONCLUSION ............................................................................................... 31

**FEDERAL CASES**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967).................................................................19

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 485324 (D.D.C. Feb. 13, 2025), *enforced*, No. CV 25-00400 (AHA), 2025 WL 569381 (D.D.C. Feb. 20, 2025) ....................................................................................................24

*Am. Acad. of Pediatrics v. Food and Drug Admin.*, 379 F. Supp. 3d 461 (D. Md. 2019)............18

*Arizona State Bd. v. U.S. Dep't of Educ.*, 391 F. Supp. 2d 800 (D. Az. 2005).............................19

*Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379 (D. Md. 2022) ....................14, 23, 30

*Bennett v. Spear*, 520 U.S. 154 (1997) ........................................................................................18

*Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184 (4th Cir. 2013) .....................................23, 30

*ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425 (D. Md. 2024).................................14

*Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162 (2008) .................................................................................................................................................24

*Den-Mat Corp. v. U.S., Food & Drug Admin.*, No. CIV. A. MJG-92-444, 1992 WL 208962 (D. Md. Aug. 17, 1992).................................................................................................................19

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414 (2021) ............................22

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)....................................................................19, 21

*Frazier v. Prince George's Cnty.*, 86 F.4th 537 (4th Cir. 2023) ...................................................14

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ......................................................................14

*Hill v. Colorado*, 530 U.S. 703 (2000) ........................................................................................16

*Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049 (C.D. Cal. 2006)...16

*Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133 (9th Cir. 2009)..............15, 16

*ICENY USA, LLC v. M & M's, LLC*, 421 F. Supp. 3d 204 (D. Md. 2019)....................................30

*Jensen v. Md. Cannabis Admin.*, 719 F. Supp. 466 (D. Md. 2024) ..............................................14

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021)........24, 25

*Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019) ....................................16

*Md. Dept. of Hum. Resources v. U.S. Dept. of Agric.*, 976 F.2d 1462 (4th Cir. 1992).................31

*Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.*, 904 F. Supp. 2d 530 (D. Md. 2012) .31

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)....................................................24

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022)......................................................................14

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 9
   (1983)...........................................................................................................................................22

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915
   F.3d 197 (4th Cir. 2019) ............................................................................................................23

*Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932
   (D.C. Cir. 2017) ..........................................................................................................................22

*Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046 (D. Or. 2018) ..................................................19

*National Ass'n of Diversity Officers in Higher Educ. v. Trump*, Case No. 1:25-cv-00333-ABA,
   2025 WL 53764 (D. Md. Feb. 21, 2025) ...................................................................................24

*National Association of Diversity Officers in Higher Education, et al. v. Donald J. Trump, et al.*,
   No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) .......................... passim

*Newsom ex. rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) .................30

*Open Communities All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ......................................24

*Packard Elevator v. I.C.C.*, 782 F. 2d 112 (8th Cir. 1986)..........................................................24

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) ...........................................................................31

*Sackett v. EPA*, 566 U.S. 120 (2012) ..........................................................................................20

*Sterling Commercial Credit—Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8
   (D.D.C. 2011) .............................................................................................................................25

*Stinnie v. Holcomb*, 77 F.4th 200 (4th Cir. 2023)........................................................................13

*Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014).......................................25

*United States v. South Carolina,* 720 F.3d 518 (4th Cir. 2013)....................................................13

*United States v. Williams*, 553 U.S. 285 (2008) ..........................................................................15

*Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023) ...........................................................................23

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ...............................................14, 23

*XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38 (D.D.C. 2015) .....................19

FEDERAL STATUTES AND REGULATIONS

2 C.F.R. § 200.208 .................................................................................................13, 29

2 C.F.R. § 200.340 .....................................................................................................4, 5

2 C.F.R. §§ 200.343, 200.344, 200.472 .........................................................................29

34 C.F.R. § 75.105 .................................................................................................5, 22, 23

5 U.S.C. § 704 ...............................................................................................................18

5 U.S.C. § 706 ...............................................................................................................18

20 U.S.C. § 1022 ........................................................................................................4, 8

20 U.S.C. § 6632 ........................................................................................................4, 8

20 U.S.C. § 6672 ........................................................................................................4, 8

20 U.S.C. § 6672(a) ........................................................................................................4

20 U.S.C. § 1232 .......................................................................................................5, 22

Fed. R. Civ. P. 65 ..........................................................................................................31

U.S. Const. Amendment V .................................................................................... *passim*

## I.     INTRODUCTION

Plaintiffs the American Association of Colleges for Teacher Education ("AACTE"), the National Center for Teacher Residencies ("NCTR"), and the Maryland Association of Colleges for Teacher Education ("MACTE") (collectively, "Plaintiffs") seek immediate injunctive relief against Defendants Denise Carter, in her official capacity as Acting Secretary of Education, the United States Department of Education (the "Department"), and Donald Trump, in his official capacity as President of the United States, (collectively, "Defendants") to remedy the unlawful termination of Plaintiffs' members' grants.

AACTE's, NCTR's, and MACTE's members together comprise hundreds of teacher preparation programs throughout the United States. Many of Plaintiffs' members (the "Grant Recipients") received grants from the Department through the Teacher Quality Partnership Program ("TQP"), the Supporting Effective Educator Development Program ("SEED"), and the Teacher and School Leader Incentive Program ("TSL"), which were used to fund programs to prepare and develop educators. Without prior warning, and in reliance on the President's recent Executive Order regarding DEI initiatives, the Department of Education recently summarily terminated many of Plaintiffs' members' TQP, SEED, and TSL grants. Not only were those terminations unlawful in reliance on Executive Order 14151, the Department also failed to follow statute and Federal regulations in terminating the grants, making the terminations unlawful under the Administrative Procedures Act too.

In the years that the Department of Education held competitions to award TQP, SEED, and TSL grants, the Department selected Priorities for applicants from a set of allowable agency Priorities enacted through a rulemaking process required by statute. These Priorities were used in the competitions to award TQP, SEED, and TSL grants to AACTE's and MACTE's member organizations and to NCTR and its member organizations. Pursuant to statute and Department

regulation, Priorities for any competitive grant program must generally be set by Congress or through notice and comment rulemaking by the Department. Only then can the final published agency Priorities apply to the competitive grant programs for selection of grantees in a particular fiscal year.

In compliance with statute and its regulation, the Department followed the notice and comment rulemaking process and established several Priorities that were allowable at the time the TQP, SEED, and TSL grant Notices for Inviting Applications at issue in this case were published in the *Federal Register* in 2020, 2022, 2023, and 2024. The Department then awarded AACTE's and MACTE's member organizations and NCTR and its member organizations up to five-year TQP grants, up to three-year SEED grants, and/or up to three-year TSL grants that remained active through early to mid-February 2025.

But in February 2025, the Department summarily terminated grants awarded under TQP, SEED, and TSL. The purported basis provided by the Department for termination was that the grants are "inconsistent with, and no longer effectuate[], Department priorities." In form letters sent along with the official termination notifications, the Department explained that:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic.

After terminating AACTE's and MACTE's member organizations' and NCTR's and its member organization's TQP and SEED grants, the Department issued a press release titled "*U.S. Department of Education Cuts $600 Million in Grants Used to Train Teachers and Education*

*Agencies on Divisive Ideologies*." *See* https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

Neither the Department's "official" reason for terminating the grants, as articulated in the Grant Award Notifications regarding Department Priorities, nor its actual, publicly-articulated reason for termination regarding DEI initiatives, were lawful. The "official" justification is unlawful because the federal government has published a regulation governing the termination of grants that the Department did not follow here. The Department's publicly articulated reason for terminating the grants was unlawful because it was predicated on portions of an Executive Order that has been enjoined by this Court.

The Department's stated reason relied, erroneously, on an implied change in "Department priorities." But Department Priorities are not subject to whim or fiat and, by statute, must instead be established through notice and comment rulemaking. The Department Priorities applicable to Plaintiffs' members' TQP, SEED, and TSL grants are the same today as they were when the grants were awarded because (a) no subsequent rulemaking has taken place; and (b) the statutes that established Priorities allowable for TQP, SEED, and TSL have not been repealed or amended. Given that the Department Priorities have not changed, and the grants were determined to meet the still-current Priorities during the competition process, it would be arbitrary *per se* for the Department to conclude that these grants are not consistent with or do not effectuate those same "Department Priorities" now.

As a result of the Department's improper early terminations, the Grant Recipients have been and will continue to be deprived of essential funding required to continue their teacher preparation programs and the continuation of the Department's unlawful terminations will irreparably harm Plaintiffs and their members. As such, Plaintiffs respectfully request that this

Court award relief to address the irreparable harm that continues to result from Defendants' unlawful actions.

## II.     BACKGROUND

### A.     Overview of TQP, SEED, and TSL Grants and Department Priorities.

#### 1.     Congress Created and Funded the TQP, SEED, and TSL Grants.

Congress authorized three programs to prepare and develop educators in the United States: TQP, SEED, and TSL. The Teacher Quality Partnership Grant Program provides funding to eligible partnerships to improve student achievement and the quality of prospective and new teachers by improving the preparation of prospective teachers and enhancing professional development activities for new teachers. *See* 20 U.S.C. § 1022. The Supporting Effective Educator Development Program provides funding to increase the number of highly effective educators in the United States by supporting the implementation of evidence-based practices that prepare, develop, or enhance the skills of educators. *See* 20 U.S.C. § 6672. The Teacher and School Leader Incentive Program provides funding to serve educators in high-need schools who raise student academic achievement and close the achievement gap between high- and low-performing students. TSL helps develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems for teachers, principals, or other school leaders. *See* 20 U.S.C. § 6632.

Congress directed the Secretary of the Department of Education (the "Secretary") to award grants, on a competitive basis, to eligible entities to provide funding consistent with the goals of TQP (20 U.S.C. § 1022a(a)), SEED (20 U.S.C. § 6672(a)), and TSL (20 U.S.C. § 6632(a)).

#### 2.     Regulations Governing Grant Terminations.

Federal regulation permits the Department of Education to terminate grants if the grants no longer effectuate Department of Education Priorities. *See* 2 C.F.R. § 200.340(a)(2) (2020);

2 C.F.R. § 200.340(a)(4) (2024)). "Department Priorities," however, is a term of art; in order to establish its Priorities, the Department must, by statute and regulation, go through a notice and comment rulemaking process. *See* 20 USC § 1232(d); 34 C.F.R. § 75.105(b)(2).

### 3. Statute and Department Regulation Requirements for Setting Priorities.

To set Department Priorities, the Secretary is required to publish agency Priorities in the *Federal Register*, which must be used to select the Priorities for a competition, and must have gone through public comment (there are five exceptions to this rule, but none are implicated here). The Secretary is likewise required to establish the specific Priorities that are included in the application for each competitive federal grant program, such as TQP, SEED, and TSL, by publishing the Priorities in the Notice Inviting Application for the grant in the *Federal Register*. (34 C.F.R. § 75.105(b)(1)).

As a federal agency, the Department is unique in the statutory requirement it has to follow for setting agency Priorities for discretionary grants. While the Administrative Procedures Act (5 U.S.C. § 553) generally exempts federal agency grants from the rulemaking process, the General Education Provisions Act (20 U.S.C. § 1232(d)) alters that rule for the Department of Education; for the Department, the grants exemption for rulemaking only applies to regulations (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines rulemaking will cause extreme hardship to the intended beneficiaries of the program. (20 U.S.C. § 1232(d)).

In sum, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process.[1]

---

[1] While there are limited exceptions to this rule, none of the exceptions are applicable to the analysis here. (*See* 34 C.F.R. 75.105(b)(2)).

Germane here, the Department held competitions for TQP grants in 2020, 2022, and 2024. It also held competitions for SEED grants in 2022, and a competition for TSL grants in 2023. For each of these competitions, and in compliance with statute and Department regulation, the Priorities were set either by Congress in the program's authorizing statute or through notice and comment rulemaking. (85 F.R. 29691-29704, 87 F.R. 10906-10923, 89 F.R. 23573-23592, 87 F.R. 19487-19496, 88 F.R. 33592-33601).

### 4. Department of Education Priorities Applicable to Now-Terminated TQP, SEED, and TSL Grants.

In 2019-2021, the Department established a set of allowable Department Priorities through the proper notice and comment rulemaking process. First, after going through the proper notice and comment rulemaking process, the Department published its Notice of Final Priority for discretionary grant programs in the *Federal Register* on November 27, 2019. (84 F.R. 65300-65303).[2] Second, also after the notice and comment rulemaking process, the Department published a Notice of Final Priorities for all discretionary grant programs in the *Federal Register* on March 9, 2020.[3] (85 F.R. 13640-13644). Then the Department went through the proper notice and comment rulemaking process once again and published its Notice of Final Priorities for TQP, SEED, and TSL grant competitions in the *Federal Register* on July 9, 2021.[4] (86 F.R. 36217-

---

[2] The Department of Education published a Notice of Proposed Priorities for public comment on July 29, 2019. (84 F.R. 36504-36507).

[3] The Department of Education published a Notice of Proposed Priorities for public comment on November 29, 2019. (84 F.R. 65734-65739).

[4] The Department of Education published a Notice of Proposed Priorities for public comment on April 20, 2021. (86 F.R. 20471-20475).

36220). That same day, again after the proper notice and comment rulemaking process, the Department published a Notice of Final Priority specific for TSL.[5]

Finally, and most recently, the Department went through the required notice and comment rulemaking process and published a Notice of Final Priorities for the Secretary's Supplemental Priorities for all discretionary grant programs in the *Federal Register* on December 10, 2021.[6] (86 F.R. 70612-70641).

**B.**     **AACTE's and MACTE's Member Organizations and NCTR and its Member Organizations were Awarded TQP, SEED, and/or TSL Grants.**

       *1.*     *Notice Inviting Applications for FY 2020, FY 2022, and FY 2024 TQP Grants.*

There were three TQP competitions relevant to this civil action. First, on May 18, 2020, the Department published a Notice Inviting Applications for the FY 2020 TQP competition inviting applicants to apply for the grant funds. (85 F.R. 29691-29704). Second, on February 25, 2022, the Department published a Notice Inviting Applications for the FY 2022 TQP competition inviting applicants to apply for the grant funds. (87 F.R. 10906-10923). Third, the Department published a Notice Inviting Applications for the FY 2024 TQP competition on April 4, 2024 inviting applicants to apply for the grant funds. (89 F.R. 23573-23592).

The project period for the FY 2020, FY 2022, and FY 2024 TQP competitions (the maximum amount of time for which the grants can be awarded) was up to five years. (85 F.R. 29699, 87 F.R. 10918, 89 F.R. 23587). All three TQP grant competitions included Priorities that

---

[5] The Department of Education published a Notice of Proposed Priority for public comment on April 9, 2021. (86 F.R. 18519-18523).

[6] The Department of Education published a Notice of Proposed Priorities for public comment on June 30, 2021. (86 F.R. 34664-34674).

were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TQP's authorizing statute (20 U.S.C. § 1022).

Grant Recipients were selected to receive funding from the FY 2020 TQP, FY 2022 TQP, and FY 2024 TQP competitions for up to a five-year period for each competition.

### 2. *Notice Inviting Applications for FY 2022 SEED Grants.*

On April 4, 2022, the Department published a Notice Inviting Applications for the FY 2022 SEED competition, inviting applicants to apply for the grant funds. (87 F.R. 19487-19496). The project period for the FY 2022 SEED competition was up to three years. (87 F.R. 19492). Just like the TQP grant competitions, the SEED grant competition included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in SEED's authorizing statute (20 U.S.C. § 6672). Grant Recipients were selected to receive funding from the FY 2022 SEED competition for up to a three-year period.

### 3. *Notice Inviting Applications for FY 2023 TSL Grants.*

Finally, there is one TSL grant competition relevant to this action. On May 24, 2023, the Department published a Notice Inviting Applications for the FY 2023 TSL competition, inviting applicants to apply for the grant funds. (88 F.R. 33592-33601). The project period for the FY 2023 TSL competition was up to three years. (88 F.R. 33598). As with the TQP and SEED grant competitions, the TSL grant competition also included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TSL's authorizing statute (20 U.S.C. § 6632). Grant Recipients were selected to receive funding from the FY 2023 TSL competition for up to a three-year period.

The five-year TQP grants, three-year SEED grants, and/or three-year TSL grants all remained active through early to mid-February 2025.

**C.**     <u>The Department's Termination of the TQP, SEED, and TSL Grants in February 2025.</u>

With no notice, and without lawful reason, the Department sent Termination Letters and updated Grant Award Notifications to the majority of the Grant Recipients in February 2025, informing them that their TQP, SEED, and TSL grants were terminated, effective immediately on the date of the letter.[7] The substance of every one of the Termination Letters sent to the Grant Recipients are identical, indicating the same reasons with the same terminology for the grant terminations. *See* Exhibit B to Complaint.

While the Termination Letters provide that the Grant Recipients may challenge the termination decision by submitting information documenting their position in writing to the Department within thirty days of the termination, any appeal to the Department does not alter the fact that the termination of funding was effective on the date of notification in February 2025. There is no funding provided starting the date of termination pending any appeals.

In both the Grant Award Notifications and the Termination Letters, the purported basis provided by the Department for termination was that the grants are "inconsistent with, and no longer effectuate[], Department priorities." In the Termination Letters, the Department went on to explain that:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's

---

[7] While the Department terminated the majority of the Grant Recipients' grants, some of Plaintiffs' member organizations did not have their TQP grants terminated yet.

policy of prioritizing merit, fairness, and excellence in education….the grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

After terminating the Grant Recipients' grants, the Department issued a press release titled "*U.S. Department of Education Cuts $600 Million in Grants Used to Train Teachers and Education Agencies on Divisive Ideologies*." (Exhibit D to Complaint).[8] The press release explains that the grants were terminated because they were using taxpayer funds to train teachers and education agencies on divisive ideologies, such as "Diversity, Equity, and Inclusion" and "equity training." *See id.*

### D. This Court's Order Granting Preliminary Injunction in *NADOHE et al. v. Trump et al.*

On February 21, 2025, this Court granted a preliminary injunction blocking the President's administration from enforcing certain provisions of Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive Order of January 20, 2025, 90 Fed. Reg. 8339 (Jan. 29, 2025) (the "J20 Order"), and Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("J21 Order"). *National Association of Diversity Officers in Higher Education, et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) (the "NADOHE Order").

---

[8]  *See*  https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

In relevant part, the NADOHE Order enjoins the President's administration from enforcing a provision in Executive Order 14151 requiring "[e]ach agency, department, . . . [to] take the following actions within sixty days of this order: (i) terminate, to the maximum extent allowed by law, . . . all . . . 'equity-related' grants or contracts" (the "Termination Provision"). In granting the preliminary injunction, the Court held that the plaintiffs showed a likelihood of success on their claim that the Termination Provision is void for vagueness under the Fifth Amendment. Specifically, the Order provides:

> Defendants other than the President, and other persons who are in active concert or participation with Defendants (the "Enjoined Parties"), shall not:
>
> > a. pause, freeze, impede, block, cancel, or terminate any awards, contracts or obligations ("Current Obligations"), or change the terms of any Current Obligation, on the basis of the Termination Provision;

Exhibit C to Complaint at page 3. The NADOHE Order benefits not just the named plaintiffs in that action, but **all** contractors and grantees who were subjected to the Termination Provision. *NADOHE v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764 at *28-29. As of the date this Court entered the NADOHE Order (February 21, 2025), Grant Recipients had already received the Termination Letters terminating their grants effective immediately.

### E.     The Effects of Termination on Plaintiffs and Their Member Organizations.

#### 1.     Effect of Grant Termination on Ability to Maintain Programs.

As of the date of the Termination Letters, funding from the terminated grants has been halted and the Grant Recipients are no longer receiving any funds from the Department under the grants they were awarded pursuant to TQP, SEED, and TSL. (Declaration of Kathlene Campbell on behalf of NCTR ("NCTR Declaration") at ¶ 12, Declaration of Carolyn Parker on behalf of American University ("AU Declaration") at ¶ 12, Declaration of Amy Smith on behalf of the University of St. Thomas ("UST Declaration") at ¶ 12, Declaration of Heather Kirkpatrick on

behalf of Alder Graduate School of Education ("Alder GSE Declaration") at ¶ 11, Declaration of Sarah Johnson on behalf of Teaching Lab ("Teaching Lab Declaration") at ¶ 12). Without the TQP, SEED, and TSL grants, Grant Recipients are unable to continue funding their work, which in turn imperils Grant Recipients' ability to maintain the programs funded by the grants. The harm to Plaintiffs and their member organizations has been severe, and a continuation of the harm is certain and irreparable in the absence of relief from this Court. (*See e.g.*, NCTR Declaration at ¶¶ 13-18, AU Declaration at ¶¶ 13-16, UST Declaration at ¶¶ 13-14, Alder GSE Declaration at ¶¶ 12-20, Teaching Lab Declaration at ¶¶ 17-26).

For example, the termination of Plaintiff NCTR's SEED grant deprives it the ability to serve K-12 school districts where there is high turnover and shortages of teachers and prepare educators for careers to help mitigate these teacher shortages. (NCTR Declaration at ¶ 18). In addition, absent Court intervention to reinstate American University's TQP grant, it will be forced to shut down its teacher preparation program for special education and early childhood education, impacting up to 1,5000 Washington D.C. children and 48 future educators. (AU Declaration at ¶¶ 13-14). Similarly, the University of St. Thomas is at risk of losing its student pipeline in areas of high-need, such as special education, as a result of the loss of funding for its teacher preparation program (UST Declaration at ¶ 13) and the termination of TQP grant funds for Alder Graduate School of Education has had and will continue to have immense impacts for more than 100 aspiring teacher candidates and mentor teachers, and hundreds of K-12 students at partner school systems. (Alder GSE Declaration at ¶¶ 13-16). In addition, the termination of TSL grant funds will result in a loss of curriculum-based professional learning and coaching services by a non-profit organization, Teaching Lab, impacting more than 40 public schools and more than 150 teachers,

whose instruction in turn reaches well over 6,000 K-12 students. (Teaching Lab Declaration at ¶¶ 8-9).

Further, as a direct result of the termination of the grants, Plaintiffs' member organizations will see a decline in enrollment, and it will exacerbate the on-going teacher shortages nationwide, and thwart their efforts to prepare future educators for success.

Finally, the termination of the Grant Recipients' grants imperils their ability to perform their primary missions as nonprofit membership organizations that depend on grants to fulfill their primary purposes for existence.

### 2.  *Effect of Special Condition on Grants.*

In addition to the immediate and irreparable effects of terminating the grants, the Department added a special condition to impacted grants requiring prior approval for them to draw down funds, referred to as "route pay." In violation of Federal regulations, the Department did not provide any notice or explanation for this blanket condition imposed on terminated grants. *See* 2 C.F.R. § 200.208. This new, unlawfully-imposed condition will cause delays in the Grant Recipients receiving their grant funds and add subjectivity to already approved costs, which the Grant Recipients reasonably fear will provide further opportunities for the Department to unlawfully deprive them of funding.

## III.  LEGAL STANDARD

A preliminary injunction is intended "to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina,* 720 F.3d 518, 524 (4th Cir. 2013); *see also Stinnie v. Holcomb*, 77 F.4th 200, 212 (4th Cir. 2023) ("The traditional office of a preliminary injunction . . . is to protect the status quo . . . ."). Such injunctive relief is warranted where a moving party has demonstrated that: "(1) the party is likely to succeed on the merits of the claim; (2) the party is likely to suffer irreparable harm in the absence of an injunction; (3) the

balance of hardships weighs in the party's favor; and (4) the injunction serves the public interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021); *see also Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The same standard applies to a temporary restraining order ("TRO"). *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425 (D. Md. 2024) ("The standards for granting a TRO and granting a preliminary injunction are the same.") (citation omitted).

## IV. ARGUMENT

The harms from the prospective and continuing effects of the grant terminations on Plaintiffs and their member organizations are devastating and irreparable. Defendants' actions violate both the Constitution and the Administrative Procedure Act. Neither principles of equity nor the public have any interest in violation of the law, much less where the violation compromises the public interest by terminating funding for programs designed to prepare, develop, and promote educators across the United States. A TRO and preliminary injunction should issue to prevent these further harms until the Court has the opportunity to further consider the merits of the case.

### A. <u>Plaintiffs are Likely to Succeed on the Merits.</u>

"To secure a preliminary injunction, a plaintiff must 'make a clear showing that [it is] likely to succeed at trial, [but it] need not show a certainty of success.'" *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 388 (D. Md. 2022) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)) (alterations in original); *see also Jensen v. Md. Cannabis Admin.*, 719 F. Supp. 466, 473 (D. Md. 2024) (same).

Plaintiffs are likely to succeed on the merits of their claims because Defendants' actions in terminating the grants were unlawful in two respects. First, the Department's publicly-articulated reason for termination in reliance on the Executive Order 14151's directive to terminate "equity-related" grants was unlawful because that portion of the Executive Order has been enjoined by this Court and found likely to violate the law. It follows that its use to terminate the grants was unlawful, and the justification for perpetuating those terminations likewise unlawful. Second, the Department's "official" reason for terminating the grants – purported inconsistency with Department Priorities – is also unlawful, arbitrary, and capricious because the federal government has published a regulation governing the termination of grants that the Department did not follow.

       *1.*       ***Plaintiffs are Likely To Succeed on their Fifth Amendment Due Process (Vagueness) Claim.***

       a.   <u>The Termination Provision is Impermissibly Vague and Violates the Fifth Amendment's Protection of Due Process (Count I).</u>

This Court has already determined that the Termination Provision is likely to be impermissibly vague in violation of the Fifth Amendment. Its use to terminate the Grant Recipients' grants, and its potential future use to terminate more of Plaintiffs' members' grants, is likewise unlawful. As a result, Plaintiffs are likely to prevail on their claim that the Department's continuing refusal to fund the grants is unlawful.

The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. A federal law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."[9] *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v.*

---

[9] While many void for vagueness arguments are directed at statutes, the same principles apply when the subject of the challenge is an executive order. *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d

*Colorado*, 530 U.S. 703, 732 (2000)); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (applying void for vagueness doctrine to "purely civil statutes").

"[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108-09 (footnotes omitted). If an executive order's terms are not "susceptible of a clear meaning," and the executive order does not "mitigate the vagueness of the term by supplying any definition," then the provision "lends itself to subjective interpretation" and is unconstitutional. *Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006).

The Termination Provision of Executive Order 14151 is unconstitutionally vague because it invites arbitrary and discriminatory enforcement. It does not define key terms, including "DEI," "DEIA," "equity" or "equity- related" and, as a result, fails to satisfy the constitutional minimum. Instead, it leaves federal agencies discretion to enforce the provision in a "seriously discriminatory" manner. *See Hill*, 530 U.S. at 732. These are broad terms; their meanings are not readily limited. As a result, the Termination Provision leaves Department's decisionmakers "the job of shaping a vague statute's contours through their enforcement decisions." *Sessions*, 584 U.S. at 182 (Gorsuch, J., concurring). Because the Department is impermissibly free to pick and choose in an arbitrary and discriminatory fashion, the Termination Provision in Executive Order 14151 is unconstitutionally vague.

---

1133, 1146-47 (9th Cir. 2009) (applying statutory void for vagueness principles and caselaw to challenge concerning executive order).

b. This Court's NADOHE Order Applies to Plaintiffs in this Action and the Department should be Enjoined from Enforcing the Termination of the TQP, SEED, and TSL Grants.

The nationwide injunction in the NADOHE Order is not explicit as to whether it requires the Department to refrain from enforcement of final action taken with respect to the subject matter covered by the Order but undertaken *before* the Order was published. While the Order's spirit makes clear that the Government's refusal to continue to fund grants canceled in adherence to the Termination Clause is prospectively unlawful, the Order does not explicitly vacate such orders or return parties to the status quo prior to agency action predicated on the Termination Clause. The Court should issue a new injunction in this case clarifying that issue as to the Grant Recipients and all similarly-situated grantees.

The Grant Award Notifications and Termination Letters did not make an explicit reference to Executive Order 14151 as the reason for terminating the grants, but the Department published a press release on February 17, 2025 that explains that the grants were terminated because they were using taxpayer funds to train teachers and education agencies on divisive ideologies, such as "Diversity, Equity, and Inclusion" and "equity training" – the same directive of the Termination Provision. (Exhibit D to Complaint). This explicit (and plainly intentional) connection of the Termination Provision in Executive Order 14151 with the grant terminations by the Government is unambiguous.

The Termination Letters also reference the Department's position to "ensure[] that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives[.]" (Exhibit B to Complaint at pages 1, 3, 5, 7, 9, 11, 13). While the Grant Award Notifications and Termination Letters state that the grants were terminated because they were "inconsistent with, and no longer effectuate[], Department priorities," it is clear from the Government's conduct that the grants were terminated pursuant to

the now-enjoined Termination Provision (which, as discussed below, is not actually a Department Priority in any case).

The NADOHE Order benefits all contractors and grantees who were subject to the Termination Provision. *NADOHE v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764 at *28-29. Even so, this Court's NADOHE Order has left a gap of unlawful conduct where the Department continues to enforce what it would be enjoined from undertaking now. Plaintiffs seek relief directing the Department to return the Grant Recipients to the *status quo ante* with respect to Executive Order 14151 and vacate or order rescinded the terminations of their TQP, SEED, and TSL grants.

### 2. The Department's Termination of the TQP, SEED, and TSL Grants Violates the Administrative Procedures Act (Count II).

The Department's termination of the grants because they were allegedly "inconsistent with, and no longer effectuate[], Department priorities" is also unlawful because it is contrary to statute and regulation the Department is obliged to follow, and thus violates the APA. 5 U.S.C. § 706(2)(A) (courts must "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

#### a. Defendants' Grant Terminations were Final Agency Actions.

Under the APA, courts may review "final agency action." 5 U.S.C. § 704. There are two hallmarks of final agency action: first, the action "mark[s] the 'consummation' of the agency's decisionmaking process;" and second, it is an action by which "rights or obligations have been determined" or "from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *see also Am. Acad. of Pediatrics v. Food and Drug Admin.*, 379 F. Supp. 3d 461, 487 (D. Md. 2019). Put another way, "[t]he core question is whether the agency has

completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

The Supreme Court has instructed that the finality requirement be applied in a "flexible" and "pragmatic" way. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967). In determining whether agency action is final, the Supreme Court has instructed courts to consider whether the action "'is sufficiently direct and immediate,' and has a 'direct effect on day-to-day business.'" *Franklin*, 505 U.S. at 796-97 (quoting *Abbott Labs.*, 387 U.S. at 152). One indicator of finality is "whether the agency views its deliberative process as sufficiently final to demand compliance with its announced position." *Den-Mat Corp. v. U.S., Food & Drug Admin.*, Civ. No. MJG-92-444, 1992 WL 208962, at *3 (D. Md. Aug. 17, 1992) (quoting *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 436 (D.C. Cir. 1986)).

Federal district courts across the country have concluded that legal consequences flow from an agency's decision to terminate future federal funding. *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1056 (D. Or. 2018) ("With respect to the second prong, legal consequences flow from an agency's decision that prohibits future federal funding."); *Arizona State Bd. v. U.S. Dep't of Educ.*, 391 F. Supp. 2d 800, 802 (D. Az. 2005) (explaining that there is "no dispute that the DOE's Determination results in 'legal consequences,' namely the prohibition of future federal funding of for-profit charter schools"); *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 60 (D.D.C. 2015) ("It is clear beyond cavil that the rejection of a request for a government benefit . . . 'fixes some legal relationship' between a private party and the government.").

Here, Defendants' termination of the Grant Recipients' grants constitutes final agency action. The Termination Letters each provide that the "Department hereby terminates grant No. [] in its entirety effective 2/[]/25." This demand for immediate compliance with the Department's

position marks the consummation of the Department's decision-making process. As of the date of the Termination Letters, the Department stopped providing funding approved by the grants. (NCTR Declaration at ¶ 12, AU Declaration at ¶ 12, UST Declaration at ¶ 12, Alder GSE Declaration at ¶ 11, Teaching Lab Declaration at ¶ 12). The Department's action unequivocally established that the rights of Grant Recipients to receive the funds was terminated. Instantly following the Department's determination to halt funding, there was a direct and immediate effect on Plaintiffs and their member organizations – without the funding from the grants, Grant Recipients cannot continue to operate their teacher preparation programs.

While the Termination Letters provide that the Grant Recipients may challenge the termination decision by submitting information documenting their position in writing to the Department within thirty days of the termination, the Department's termination took effect immediately, and even if a Grant Recipient challenges the determination, the funding will not resume absent intervention from this Court. And while the Termination Letters invite Grant Recipients to submit an objection to the termination decision, they contain no promise that the Department will conduct a further review, nor any timeframe or process by which the Department intends review such a challenge, if at all.[10] In any event,"[t]he mere possibility that an agency might reconsider" its decision "does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). Accordingly, the Department's termination of the grants constitutes final action under the APA. *See id*.

---

[10] The Termination Letters are problematic for other reasons, too. Most notably, the form letters failed to provide basic notice by omitting any specificity about the reason that the Department found any individual grant "inconsistent with. . . Department priorities." The letters instead merely list, disjunctively, five vague ways in which the specific grant at issue might be "inconsistent." This does not put the Grant Recipients on notice for the reason for termination and of course thereby deprives them of any meaningful basis to challenge the termination.

The consequences of the termination of grant funds has already been felt by the Grant Recipients. As a result of the termination of their TQP, SEED, and TSL grants, Grant Recipients will be unable to continue their teacher preparation programs established and run by the grants' funding, which of course has a direct impact on their day-to-day business. *See Franklin*, 505 U.S. at 796-97 (quoting *Abbott Labs.*, 387 U.S. at 152). For example, the termination of NCTR's SEED grant will result in a $1,188,070 overall loss, including a $332,000 direct loss to NCTR, as well as a loss of $360,000 in expenses to contractors and a $495,000 loss in subgrants to the thirteen teacher residency programs funded by the grant. (NCTR Declaration at ¶ 13). Without their terminated grant funds, American University will no longer be able to maintain its teacher preparation program designed to remedy the dramatic teacher shortage and improve outcomes for early childhood and special education students in Washington D.C. (AU Declaration at ¶ 13). Likewise, due to the termination of its TQP grant, the University of St. Thomas is at risk of losing in student pipeline, such as special education, resulting in widespread negative impacts on the many communities, teachers and students these teacher pipeline programs benefit. (UST Declaration at ¶ 13). By way of yet another example, the Department's termination of two TQP grants for Alder Graduate School of Education has immense impacts on its day-to-day business, affecting teacher preparation programs with 83 current teacher candidates and thwarted plans to recruit 80 additional teacher candidates in the remaining years of the grants. (Alder GSE Declaration at ¶¶ 13-15). Furthermore, as a direct result of the termination of a TSL grant, a non-profit organization which provides professional learning and coaching services to improve teacher practice and student learning will no longer be able to provide such services to over 40 schools. (Teaching Lab Declaration at ¶¶ 9, 17-18).

The termination of the Grant Recipients' TQP, SEED, and TSL grants is also resulting in, and will continue to result in, loss of employment for the dedicated staff members and grant managers who worked to make the teacher preparation programs run, a harm that cannot be remedied at summary judgment when fundamental changes to the structure and business of Plaintiffs' members have already been made by necessity. (*See e.g.*, NCTR Declaration at ¶ 14, AU Declaration at ¶ 16, Alder GSE at ¶ 17). Termination of the grants will also lead to a decline in enrollment at many of Plaintiffs' member organizations. (*See e.g.*, AU Declaration at ¶ 13, Alder GSE Declaration at ¶¶ 14-15, NCTR Declaration at ¶ 14).

### b. Defendants' Action are Arbitrary and Capricious.

The termination of the subject grants is unlawful, arbitrary, and capricious because it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). While a court may not "substitute its own policy judgment for that of the agency," *id.*, it must ensure that the agency has "examine[d] the relevant data and articulate[d] 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 9, 43 (1983). Agency action is "substantive[ly] unreasonable[]" when "the agency exercised its discretion unreasonably." *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.). Where, as here, the Department exercises its discretion to act counter to statute and regulation, its action is *per se* unreasonable.

The proffered reason by the Department for the termination of the grants – that they "are inconsistent with, and no longer effectuates, Department priorities" – is contrary to the law. Statute and regulation require the Secretary to publish Department Priorities for program grants in the *Federal Register*, subject to a notice and comment period. (20 U.S.C. § 1232(d), 34 C.F.R.

§ 75.105(b)(2)). The Secretary then selects allowable Priorities to include in the applications for the grant competitions which are published in the *Federal Register*. (34 C.F.R. § 75.105(c)). The Department cannot, by law, determine that with a change in administration, specific Department Priorities for grant programs are no longer allowable unless and until the Department engages in rulemaking to propose and issue new Final Priorities.

Simply put, the current administration has not gone through a notice and comment rulemaking process to issue new Final Priorities, so the current Final Priorities remain Department Priorities. As a result, and contrary to the Department's official reasons, the grants at issue ***are*** consistent with the current Department Priorities. It would be arbitrary *per se* for the Department to conclude that these grants are not consistent with or do not effectuate those same "Department Priorities" merely because they say so. If the Department wishes to establish new Department Priorities, it may do so only through the means established by law, not through whim or fiat.

### B.      In the Absence of an Injunction, Plaintiffs are Certain to Suffer Irreparable Harm.

To obtain a preliminary injunction, a plaintiff must "demonstrate irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original, collecting cases); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Harm is irreparable if the injury "cannot be fully rectified by the final judgment after trial." *Ass'n of Am. Publishers*, 586 F. Supp. 3d at 388 (quoting *Mountain Valley Pipeline, LLC*, 915 F.3d at 216; *Vitkus v. Blinken*, 79 F.4th

352, 367 (4th Cir. 2023) (finding existence of irreparable harm where no adequate relief could be recovered at the conclusion of trial).

A showing of irreparable harm occurs where a plaintiff demonstrates a likelihood of success on the merits of a constitutional claim. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied.") (citation omitted); *see also Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

A mission-oriented organization also has a likelihood of irreparable injury where "the 'actions taken by the defendant have perceptively impaired the organization's program'" and "make it more difficult for [organizations] to accomplish [their] primary mission[s]." *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017); *AIDS Vaccine Advoc. Coal. v. United States Dep't of Stat*e, No. CV 25-00400 (AHA), 2025 WL 485324, at *4 (D.D.C. Feb. 13, 2025), *enforced*, No. CV 25-00400 (AHA), 2025 WL 569381 (D.D.C. Feb. 20, 2025) (finding irreparable injury where loss of funding would make it more difficult to accomplish organization's primary mission).

In addition, economic harm may also prove irreparable if it is severe enough to threaten an organization's existence. *Packard Elevator v. I.C.C.*, 782 F. 2d 112, 115 (8th Cir. 1986) ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the [plaintiff]'s business."); *see also National Ass'n of Diversity Officers in Higher Educ. v. Trump*, Case No. 1:25-cv-00333-ABA, 2025 WL 53764, at *26 (D. Md. Feb. 21, 2025) (same); *Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp.

2d 162, 168 (2008) ("To successfully shoehorn potential economic loss into a showing of irreparable harm, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence.") (citations omitted); *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 243-44 (D.D.C. 2014) (finding irreparable harm that is economic in nature where non-profit completely "shut out" of hospital funding program). "The critical consideration under this exception is the effect that the purported economic harm will have on a movant's business or its very existence—not any monetary amount per se." *Sterling Commercial Credit—Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 15 (D.D.C. 2011).

### 1. Certain and Irreparable Harm to Plaintiffs and Their Member Organizations.

*First*, there is a likelihood of success on the merits of a constitutional claim here, and thus the irreparable harm factor is *per se* satisfied. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

*Second*, the Grant Recipients are being deprived of essential funding required to continue their teacher preparation programs. Without Court intervention, Defendants' actions unlawfully depriving them of funding will:

- Force many Grant Recipients to shutter their programs, including teacher preparation programs designed to support educators in critical areas of need, including special education and early childhood education. (*See e.g.*, AU Declaration at ¶ 13).

- Significantly reduce the Grant Recipients' ability to address the on-going teacher shortage and cause an exacerbation of the teacher shortage, especially in rural and urban communities, across the country. (*See e.g.*, NCTR Declaration at ¶ 18; Alder GSE Declaration at ¶ 16).

- Result in termination of employment for the dedicated staff members, coaches, and grant managers who work to make the teacher preparation programs run. (*See e.g.*, NCTR Declaration at ¶ 14; AU Declaration at ¶ 16; Alder GSE Declaration at ¶ 17; Teaching Lab Declaration at ¶¶ 19-20).

- Result in a widespread cut and/or reduction of scholarships and living wage stipends for future educators to pursue degrees in education in underserved rural, urban, suburban, and exurban communities. (*See e.g.*, UST Declaration at ¶¶ 7-8; Alder GSE Declaration at ¶¶ 13-15).

- Result in a widespread cut and/or reduction of mentor teacher stipends for teachers in K-12 schools who work to train and develop new teachers in areas of high-need. (*See e.g.*, Alder GSE Declaration at ¶¶ 13-15).

- Cut curriculum-based professional learning and coaching services designed to improve teacher practice and student learning at over 40 K-12 schools and result in a loss of a rigorous study to help school districts evaluate how best to spend their limited funds and limited teacher development time and resources. (Teaching Lab Declaration at ¶¶ 9, 17-18, 21-22).

- Lead to a decline in enrollment at many of Plaintiffs' member organizations. This includes a decline in current enrollment for students participating in teacher preparation programs who will no longer be able to afford to attend Plaintiffs' member organizations due to the termination of funding supplied for stipends, support for licensure examinations and tutoring, and tuition assistance. The termination of grants also impairs the ability of Plaintiffs' member organizations to recruit future students. (*See e.g.*, AU Declaration at ¶ 13, Alder GSE Declaration at ¶¶ 14-15, NCTR Declaration at ¶ 14).

For the Grant Recipients, the harm is actual, not theoretical, as the funding was terminated in February 2025, immediately resulting in many of the Grant Recipients' inability to continue their programs. The harm to the participants was even more impactful given that the terminations occurred in the middle of the school year. Similarly, for any Grant Recipients whose grants have not yet been terminated, but whose termination is forthcoming, and similarly situated to the grants at issue here, the imminence of their injuries is evident from the Department's publicly-articulated desire to cut these grants used to train teachers and education agencies and the plain language of the directive from the Executive Order to take immediate action with *at most* 60 days from the date of the January 20, 2025 order. It is clear that the Department is moving swiftly to eliminate funding for all teacher preparation grants, and the termination of the grants that have not been terminated is imminent. The harm that this loss of funding will cause nationally is likewise immense, strangling the viability of the teacher preparation programs that schools and communities desperately need.

The termination of the grants also completely eviscerates' Plaintiffs' missions to "elevate education and educator preparation through research, professional practice, advocacy, and collaboration," to "transform educator preparation by advancing the teacher residency movement to prepare, support, and retain more effective educators who represent and value the communities they serve" and to "serve as a distinct statewide voice on matters of importance to educator preparation programs at [] colleges and universities." [11] Without the TQP, SEED, and TSL grants to fund the teacher preparation programs, Plaintiffs and their member organizations will no longer be able to prepare/support and retain educators, which not only thwarts their missions, but also has

---

[11] *See* https://aacte.org/about/, https://nctresidencies.org/about-nctr/, https://mactemaryland.wixsite.com/maryland-association.

a devastating impact on the communities they serve. With the loss of funding and slashed programs, Plaintiffs' member organizations will no longer be able to support and train teaching candidates to work in partner K-12 schools. Many pre-K through year 12 schools rely on the teacher preparation programs funded by the TQP, SEED, and TSL grants to support their students. For example, without their TQP grant funding, American University will no longer be able to fund additional cohorts of its teacher residency program. As a result, the Washington D.C. Friendship Public Charter Schools will lose the support of the teacher candidates working in their early childhood and special education classrooms. (AU Declaration at ¶ 13). The University of St. Thomas will no longer be able to fund a majority of scholarships for undergraduate and graduate students who are pursuing teacher licensure and degrees in special education and elementary education. (UST Declaration at ¶¶ 6, 7). The stipends for Alder Graduate School of Education's aspiring teachers and mentor teachers at its partner K-12 school systems will lose the majority of their funding, resulting in expected harm of over $2 million for the partner K-12 school systems. (Alder GSE Declaration at ¶¶ 13-16). Teaching Lab will no longer be able to provide professional learning and coaching services to over 40 K-12 schools. (Teaching Lab Declaration at ¶¶ 9, 17-18). NCTR's thirteen teacher residency programs that were funded by a terminated grant are all in jeopardy, depriving Plaintiff NCTR of its ability to serve K-12 school districts where there is a high turnover and shortages of teachers and prepare educators for careers to help mitigate these teacher shortages. (NCTR Declaration at ¶ 18).

### 2. Harm Resulting from Defendants' Unlawfully Imposed Grant Conditions.

The Grant Recipients are also being harmed by the Department's special condition put on the grants during their period for drawing down the funds. Generally, unless a grantee poses a specific risk, they can draw down funds from their grant award based on the allowable, allocable

and reasonable costs approved in their grant budget without prior approval. Here, the Department added a special condition to impacted grants after they were terminated requiring prior approval for them to draw down funds. This special condition is referred to as "route pay." The grantees are eligible for costs that were properly incurred before their termination date and costs that would not have occurred if the grant was not terminated. They have 120 days to draw down the funds after the termination date. (2 C.F.R. §§ 200.472, 200.343, 200.344(b)).

The regulations that govern federal grants set the reasons that the Department can put conditions on grants and the requirements for notice prior to doing so. Imposing a special condition, such as establishing additional prior approvals, on a grant can only be done if the grantee is determined to pose a risk. Factors that may be considered are financial stability, quality of management systems and standards, history of performance, audit reports and filings, ability to effectively implement requirements, history of compliance with conditions of a federal award, or a responsibility determination. (2 C.F.R. § 200.208).

Before conditions are placed on a grant, the agency must notify the grantee as to: (1) the nature of the additional requirements; (2) the reason why the additional requirements are being imposed; (3) the nature of the action needed to remove the additional requirement, if applicable; (4) the time allowed for completing the actions if applicable; and (5) the method for requesting reconsideration of the additional requirements imposed. (*Id*.).

Without notice or any finding of individual grantee risk, the Department put a blanket condition on the terminated grants to require prior approval for all remaining drawdowns. This new, unlawfully-imposed condition will cause delays in the Grant Recipients receiving their grant funds and potential subjectivity added to disturbing already approved costs.

## C.     The Balance of Equities and Public Interest Favor Injunctive Relief.

With regard to the final two factors, which merge for purposes of this analysis, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Ass'n of Am. Publishers*, 586 F. Supp. 3d at 388 (quoting *Winter*, 555 U.S. at 23; *see also ICENY USA, LLC v. M & M's, LLC*, 421 F. Supp. 3d 204, 222-23 (D. Md. 2019).

Here, the balance of the equities favors preliminary relief because Fourth Circuit caselaw "counsels that '[the government] is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac*, 722 F.3d at 191 (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). Similarly, it is axiomatic that the public interest favors protecting constitutional rights. *See id.* ("It also teaches that 'upholding constitutional rights surely serves the public interest.'") (quoting *Giovani Carandola*, 303 F.3d at 521); *see also Newsom ex. rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (recognizing that a governmental entity "is in no way harmed by issuance of a preliminary injunction" that prevents enforcement of a policy likely to be found unconstitutional).

The equities also tip in Plaintiffs' favor. On one hand, requiring the Department to continue the Grant Recipients' grants would continue the status quo that would have resulted had the Department not unlawfully terminated the grants. The government would suffer no harm if the preliminary injunction is granted, just as they suffered no harm from the status quo before the grants were terminated. The Department would simply be directed to continue its regular obligation of Congressionally-approved funding that it had already committed to spend to fund the TQP, SEED, and TSL grants. On the other hand, the Grant Recipients' teaching preparation programs provide an essential service furthering important public interest in education that will be

destroyed absent Court intervention. Accordingly, the balance of equities and public interest favor injunctive relief.

### D. No Bond Is Necessary.

Fed. R. Civ. P. 65(c) contemplates "security" the Court can order to "pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A district court may waive the bond requirement. *See Md. Dept. of Hum. Resources v. U.S. Dept. of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (recognizing "a district court's discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm") (citing cases); *see also Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.*, 904 F. Supp. 2d 530, 536 (D. Md. 2012) ("Where the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant, the court may fix the amount of bond accordingly. In some circumstances, a nominal bond may suffice.") (quoting *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 Fed. App'x. 134, 139 (4th Cir. 2001)); *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement."). Indeed, in *NADOHE*, this Court effectively waived the bond requirement and "set a nominal bond of zero dollars." No. 1:25-CV-00333-ABA, 2025 WL 573764 at *30. Accordingly, Plaintiffs request that no bond or security be ordered. In the alternative, Plaintiffs request a nominal bond of $100.

## V. CONCLUSION

For these reasons, and the reasons set forth herein, Plaintiffs respectfully request that the Court enter a temporary restraining order or preliminary injunction. A proposed order accompanies the instant Motion.

Dated: March 3, 2025                    Respectfully Submitted,

    */s/ Daniel M. Moore*
Daniel M. Moore (Bar No. 21834)
SAUL EWING LLP
1001 Fleet Street, Ninth Floor
Baltimore, Maryland 21202-4359
Telephone: (410) 332-8734
Facsimile: (410) 332-8862
daniel.moore@saul.com

Joshua W.B. Richards (*Pro Hac Vice Forthcoming*)
Carolyn M. Toll (*Pro Hac Vice Forthcoming*)
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
Tel: (215) 972-7737
joshua.richards@saul.com
carolyn.toll@saul.com

*Counsel for Plaintiffs*