## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| AACTE, *et. al.*, | * | |
| | * | |
| PLAINTIFFS, | * | |
| | * | |
| v. | * | No. 25-cv-702 (JRR) |
| | * | |
| McMAHON, *et al.*, | * | |
| | * | |
| DEFENDANTS. | * | |

\*\*\*\*\*\*

## RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................................... 1

TABLE OF AUTHORITIES ................................................................................................... 3

TABLE OF ACRONYMS ........................................................................................................ 6

I.    INTRODUCTION ........................................................................................................... 7

II.   BACKGROUND FACTS ............................................................................................... 8

    A.   Department of Education ("DOE") terminated a number of grants that participated in Diversity, Equity, and Inclusion ("DEI") programming.................................... 8

    B.   On February 21, 2025, Judge Adam Abelson in the District of Maryland enjoined the government from enforcing three provisions in the J20 and J21 orders. ........ 10

    C.   The evening of March 10, 2025, the United States District Court for the District of Massachusetts entered a temporary restraining order in an APA challenge to DOE grant termination that provides relief to at least some of the Plaintiffs in this action. ...................................................................................................................... 11

III.  LEGAL STANDARD .................................................................................................... 12

IV.   ARGUMENT .................................................................................................................. 12

    A.   Venue is not proper in the State of Maryland because no substantial part of the events or omissions giving rise to the claim occurred here. ................................. 13

B.    The complaint lacks sufficient facts to establish Plaintiff MACTE's organizational standing. ............................................................................................................ 16

C.    Plaintiffs cannot piggyback on *NADOHE*'s analysis because *NADOHE* is not binding and they are differently situated. .............................................................. 17

     1.    *NADOHE's* holding hinged on First Amendment violations but these Plaintiffs have no First Amendment claim. .............................................. 18

     2.    *NADOHE* held that the likelihood of establishing vagueness stemmed from uncertainty regarding grant termination, but the instant Plaintiffs have already had their grants terminated. ........................................................... 19

     3.    *NADOHE* challenged the potential enforcement of the J20 termination provision, while the instant case challenges an actual agency decision not definitively tied to the J20 termination provision. .................................... 20

D.    Plaintiffs are unlikely to succeed on the merits of their vagueness claim. ........... 21

E.    Plaintiffs are unlikely to succeed on their APA claim because enacting a new administration's priorities, consistent with federal law, is not arbitrary or capricious. ............................................................................................................. 23

F.    Two of the final three preliminary injunction factors – balance of equities and public interest – weigh in favor of the Government. ............................................. 27

G.    To the extent the Court is inclined to grant a preliminary injunction, it should instead remand to DOE for further development of the record. ........................... 29

H.    If the Court grants a preliminary injunction, its scope should be limited only to the cancelled grants identified in Plaintiffs' motion. .................................................. 30

V.    CONCLUSION ................................................................................................................. 31

**TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

*AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*,
  __ F. Supp. 3d __, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ........................................ 20, 30

*Ass'n of Jewish Camp Operators v. Cuomo*,
  470 F. Supp. 3d 197 (N.D.N.Y. 2020) ................................................................. 27

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
  501 U.S. 1301 (1991) ............................................................................. 27

*Brown v. Board of Education*,
  347 U.S. 483 (1954) ................................................................................ 8

*Chakrabarti v. U.S. Citizenship and Immigration Servs., No 21-1945 PJM*,
  2021 WL 4458899 (D. Md. Sept. 29, 2021) ...................................... 13, 14, 15, 16

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................. 17

*Covenant Media of SC, LLC v. N. Charleston*,
  493 F.3d 421 (4th Cir. 2007) .................................................................... 16

*Educ. Media Co. v. Insley*,
  731 F.3d 291 (4th Cir. 2013) .................................................................... 20

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
  592 U.S. 414 (2021) .......................................................................... 24, 30

*Frazier v. Prince George's Cnty.*,
  86 F.4th 537 (4th Cir. 2023) .................................................................... 12

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ............................................................................. 22

*Havtech, LLC v. AAON Inc., No. CV SAG-22-00453*,
  2023 WL 200117 (D. Md. Jan. 17, 2023) ........................................................ 22

*Hoffler v. Mattis*,
  677 Fed. Appx. 119 (4th Cir. 2017) .............................................................. 24

*Indus. Union Dep't, AFL-CIO v. Bingham*,
  570 F.2d 965 (D.C. Cir. 1977) ................................................................... 13

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................. 16

*Marsh v. Oregon Nat. Res. Council*,

490 U.S. 360 (1989) ................................................................................ 24

*Miranda v. Garland*,
34 F.4th 338 (4th Cir. 2022) ................................................................ 27

*Nat'l Assoc. of Diversity Officers in Higher Educ. (NADOHE) v. Trump*,
__ F. Supp. 3d. __, 2025 WL 573764 (D. Md. Feb. 21, 2025) ......................... ibid

*Nat. Res. Def. Council, Inc. v. Envtl. Prot. Agency*,
16 F.3d 1395 (4th Cir. 1993) ................................................................ 24

*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) ............................................................................ 22

*Nat'l Union Fire Ins. Co. v. Allfirst Bank*,
282 F. Supp. 2d 339 (D. Md. 2003) ...................................................... 17-18

*Nken v. Holder*,
556 U.S. 418 (2009) ......................................................................... 12, 27

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .............................................................................. 24

*Students for Fair Admissions, Inc. v. Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .......................................................................... 8, 28

*Trump v. Int'l Refugee Assistance Project*,
582 U.S. 571–80 (2017) ...................................................................... 30

*United States v. Davis*,
588 U.S. 445 (2019) ............................................................................21

*United States v. Saunders*,
828 F.3d 198 (4th Cir. 2016) ................................................................ 21

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ............................................................................ 16

*Vill. Of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
455 U.S. 489, 498 (1982) ........................................................... 18, 19, 21 22

*Wilson v. PL Phase One Operations L.P.*,
422 F. Supp. 3d 971 (D. Md. 2019) ...................................................... 22

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ............................................................................... 12

*Wolf v. Menh, No. 1:18-cv-1180*,
2019 WL 13292992 (E.D. Va. Feb. 5, 2019) ...........................................14

**Statutes**

20 U.S.C. § 1232 ................................................................................................ 25

28 U.S.C. § 1391 ................................................................................................ 13

28 U.S.C. § 1404 ................................................................................................ 16

**Rules**

F.R. 19487-01 .................................................................................................... 23

F.R. 23573 ......................................................................................................... 23

F.R. 33592 ......................................................................................................... 23

**Regulations**

2 C.F.R. § 200.340 .................................................................................. 9, 23, 25, 26

34 C.F.R. § 75.105 ...................................................................................... 25, 26

90 Fed. Reg. 8339, 8339 (Jan. 29, 2025) ................................................................. 8

90 Fed. Reg. 8633, 8634-35 (Jan. 31, 2025) ............................................................. 8

**Other**

*Eloise Pasachoff, Executive Branch Control of Federal Grants: Policy, Pork, and Punishment*,
    83 Ohio St. L.J. 1113 (2022) ...................................................................... 26, 27

## TABLE OF ACRONYMS

| Acronym | Full Name |
| --- | --- |
| AACTE | American Association of Colleges for Teacher Education |
| APA | Administrative Procedure Act |
| AU | American University |
| CFR | Code of Federal Regulations |
| DEI | Diversity, Equity, and Inclusion |
| DOE | Department of Education |
| EO | Executive Order |
| FR | Federal Register |
| GSE | Graduate School of Education |
| J20 | Exec. Order No. 14,151, Ending Radical and Wasteful Government DEI Programs and Preferencing, Executive Order of January 20, 2025, 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025) |
| J21 | Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633, 8634-35 (Jan. 31, 2025) |
| MACTE | Maryland Association of Colleges for Teacher Education |
| NADOHE | National Diversity Officers in Higher Education |
| NCTR | National Center for Teacher Residencies |
| PI | Preliminary Injunction |
| RETL | Residency for Excellence in Teaching and Learning |
| RISE | Refine, Innovate, Share, and Elevate |
| SEED | Supporting Effective Educator Development Program |
| SFFA | *Students for Fair Admissions, Inc. v. Fellows of Harvard Coll.*, 600 U.S. 181 (2023) |

| TQP | Teacher Quality Partnership Program |
| TRO | Temporary Restraining Order |
| TSL | Teacher and School Leader Incentive Program |
| UST | University of St. Thomas |

## I.    <u>INTRODUCTION</u>

This Court should reject Plaintiffs' attempt to glom onto Judge Abelson's decision in *National Association of Diversity Officers in Higher Education* ("NADOHE") *v. Trump*.[1] Despite advancing no First Amendment claims, Plaintiffs argue that the more stringent Fifth Amendment vagueness standard applicable to free speech challenges applied in *NADOHE* should apply to them. And despite receiving concrete grant terminations specifying the reasons for their grant terminations, Plaintiffs argue that *NADOHE*'s analysis about potentially vague grant terminations in the abstract should also apply to them. These arguments lack merit. Not only is venue improper in Maryland and not only does the only Maryland plaintiff lack standing, but Plaintiffs are also unlikely to succeed on the merits of their Due Process or Administrative Procedure Act ("APA") claims. Because the balance of equities and public interest also weigh in favor of the government, the Court must deny Plaintiffs' motion for a Preliminary Injunction ("PI") or Temporary Restraining Order ("TRO").

---

[1]    ECF 1 No. 1:25-CV-00333-ABA. Hereafter, "*NADOHE*."

## II.    BACKGROUND FACTS

### A.    Department of Education ("DOE") terminated grants that participated in Diversity, Equity, and Inclusion ("DEI") programming.

On January 20, 2025, President Trump issued Executive Order 14,151, 90 FR 8339, entitled *Ending Radical and Wasteful Government DEI Program and Preferencin*g [hereafter J20]. J20 sought to eliminate "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)," in the Government.   J20 § 1.  As is relevant here, J20 includes a Termination Provision, which directs that within 60 days of its issuance, "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM … terminate . . . 'equity-related' grants or contracts."   *Id.* § 2(b)(i).   This has been referred to as the "Termination Provision."   The President also issued a second executive order related to DEI on January 21, 2025 [hereafter J21], but Plaintiffs do not challenge that order.

On February 5, 2025, DOE's Office of Planning, Evaluation, and Policy Development issued a "Directive on Department Grant Priorities."   ECF 24-2 (Directive on Development Grant Priorities, U.S. Dept. of Educ. (Feb. 5, 2025)) [hereafter, "DOE Directive"].   *Available online at* Prem Thakker, X.com,   https://x.com/prem_thakker/status/1887261853350318163?s=46   (last accessed Mar. 11, 2025).   The internal directive reaffirms the Department's priority "to eliminate discrimination in all forms of education."   ECF 24-2 (DOE Directive) (citing to *Brown v. Board of Education*, 347 U.S. 483 (1954) and *Students for Fair Admissions, Inc. v. Fellows of Harvard Coll.*, 600 U.S. 181 (2023) [hereafter "*SFFA*"]).   It notes that Diversity, Equity, and Inclusion ("DEI") initiatives "unlawfully discriminate on the basis of race, color, religion, sex, national origin, or other protected characteristic" and "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education."   *Id.*   The directive instructs DOE personnel to conduct a review of issued grants to ensure they "do not fund discriminatory practices – including in the

form of DEI – that are either contrary to law or to the Department's policy objectives." *Id.* The directive further requires DOE to "comply with all notice and procedural requirements in each affected award, agreement, or other instrument." *Id.* Finally, it notes that "[g]rants deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements." *Id.* The directive does not reference any executive order related to DEI but rather relies on DOE's own policies and priorities. *Id.*

Plaintiffs are member organizations comprised of some members who received grant money from three DOE programs: The Teacher Quality Partnership Program ("TQP"); the Supporting Effective Educator Development Program ("SEED"); and the Teacher and School Leader Incentive Program ("TSL"). The grants were multi-year grants meant to support teacher professional development and training programs. ECF 1 at ¶¶ 65–127. Plaintiffs' programs included diversity, equity, and inclusion components. *See, e.g.*, ECF 1 at ¶¶ 79, 81, 101.

The complaint alleges that between approximately February 7 and 18, 2025, DOE terminated eight of its member association grants. ECF 1 at ¶¶ 119–27 (describing anonymous grant recipient); ECF 1-2 (identifying named grant recipients). The termination letters specified that the grants were terminated for "promot[ing] or tak[ing] part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." *See, e.g.*, ECF 1-2 at 4. The letter noted that the grants "no longer effectuate[] Department priorities" pursuant to 2 C.F.R. § 200.340(a)(4). Each letter included statutory authority for the action, advised recipients of their appeal rights, and advised regarding closeout responsibilities. *See, e.g.*, ECF 1-2 at 4–5. No letter referenced any Presidential Executive Order as a source of authority.

9

**B.      On February 21, 2025, Judge Adam Abelson in the District of Maryland enjoined the government from enforcing three provisions in the J20 and J21 orders.**

The District of Maryland was one of the first courts in the country to hear a challenge to the J20 and J21 orders.  In *NADOHE*, Judge Abelson considered a challenge to three provisions in the orders, including a provision in the J20 order that called for government agencies to "terminate. . . equity-related' grants or contracts."[2]  *See generally, NADOHE*, ECF 1, No. 1:25-CV-00333-ABA.  The *NADOHE* Plaintiffs were federal grant recipients whose grants remained active, but who feared termination pursuant to the J20 order.  *See, e.g.*, *NADOHE*, ECF 1 at ¶¶ 5–6.  They claimed that the fear of losing their funding chilled their freedom of speech, as they were afraid that engaging with DEI values would cause them to lose their funding.  *Id.* at ¶ 12.  They also claimed the J20 order was vague because it "failed to define any material terms, including 'DEI,' 'illegal DEI,' 'DEI programs or principles,' or 'illegal discrimination or preferences.'"  *Id*. at ¶ 4.  Plaintiffs filed a motion for a TRO or PI about ten days after filing the complaint.  *NADOHE*, ECF 27.  Because no plaintiff grants had been terminated, the challenge was a "facial" challenge to the entire order without reference to how the order might be applied in any individual case.  *NADOHE*, __ F. Supp. 3d. __, 2025 WL 573764, at *16 (D. Md. Feb. 21, 2025).

Judge Abelson held a hearing and ultimately granted the plaintiffs' motion for a preliminary injunction on February 21, 2025.  In so doing, Judge Abelson considered the plaintiffs' Fifth Amendment challenge to the J20 order's termination provision through the lens of a free speech challenge, applying "a more stringent vagueness test."  *NADOHE*, 2025 WL 573764, at

---

[2]      *NADOHE* also challenged the J21 Executive Order, but since that Order is not the subject of the instant lawsuit it is not discussed here.

*26.  Applying this more rigorous test, Judge Abelson determined that plaintiffs were likely to show that the termination provision did not provide sufficient notice of prohibited activity and carried the potential for arbitrary enforcement.  *Id.* at *19–21.  Because no *NADOHE* plaintiff had experienced a grant termination, Judge Abelson's ruling considered the general landscape and hypothetical scenarios.  *See id.* at *20.  His preliminary injunction order prevented "Defendants other than the President, and other persons who are in active concert or participation with Defendants," from, in relevant part, "paus[ing], freez[ing], imped[ing], block[ing], cancel[ing], or terminat[ing] any awards, contracts, or obligations ("Current Obligations") or change the terms of any Current Obligation, on the basis of the Termination Provision."  ECF 1-3 at 3 (*NADOHE* Preliminary Injunction Order).

On March 10, 2025, following supplemental motions practice, Judge Abelson clarified that "persons who are in active concert or participation with Defendants" meant "all other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions directed pursuant to the J20 and J21 Orders."  *NADOHE,* ECF 67 at 3.  Neither the initial order nor the clarified order applied retroactively to any grants cancelled before entry of the order on February 21, 2025.  The clarified order reiterated that *NADOHE's* holding regarding vagueness of the J20 termination provision utilized "the more stringent vagueness test that applies when a law interferes with the right of free speech or of association."  *NADOHE*, ECF 66 at 5.

**C.    The evening of March 10, 2025, the United States District Court for the District of Massachusetts entered a temporary restraining order in an APA challenge to DOE grant termination that provides relief to at least some of the Plaintiffs in this action.**

On March 6, 2025, the States of California, Colorado, Illinois, Maryland, Massachusetts, New Jersey, New York, and Wisconsin filed a motion for temporary restraining order challenging the allegedly arbitrary and capricious termination of TQP and SEED grants.  *See generally*, Mot.

11

for Temp. Restr'g O., *California v. U.S. Dep't of Educ.*, 1:25-cv-10548-MJJ, ECF No. 2 (D. Mass. Mar. 6, 2025). Judge Joun held a hearing on March 10, 2025, seemingly without the benefit of written briefing from the government. *See generally*, ECF 24-3 (Docket, 1:25-cv-10548-MJJ (reflecting no motion response from the government)). After the hearing, the Judge Joun granted Plaintiffs' motion for a temporary restraining order and required DOE to "immediately restore . . . all previously awarded TQP or SEED grants for recipients in Plaintiff states." ECF 24-4 (Order, *California v. U.S. Dep't of Educ.*, 1:25-cv-10548-MJJ, ECF No. 41, at 9 (D. Mass. Mar. 6, 2025)).

## III.    **LEGAL STANDARD**

A preliminary injunction is "extraordinary" relief that may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). Plaintiffs must satisfy four elements to show entitlement to a preliminary injunction: first, they must show that they are likely to succeed on the merits; second, that they will likely experience irreparable harm unless the court grants relief; third, that the balance of equities weighs in their favor; and fourth that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023); *NADOHE*, 2025 WL 573764, at *7. The last two factors – balance of equities and the public interest – "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## IV.    **ARGUMENT**

Plaintiffs cannot establish entitlement to a preliminary injunction. Their case fails at the threshold due to improper venue and lack of standing. The Court should decline to extend the *NADOHE* holding to these Plaintiffs due to the dissimilarity of their claims. On the merits, Plaintiffs' case fails because their actual grant terminations were not vague as applied to them. Nor did DOE act arbitrarily and capriciously when it terminated Plaintiffs' grants consistently with

its departmental priorities. For the purposes of this motion, Defendants do not dispute that Plaintiffs can establish irreparable harm, but the government does contend that the balance of equities and public interest weighs in the government's favor. Should the Court consider granting relief, Defendants respectfully request that the Court instead remand to DOE to provide a more detailed explanation for each grant termination. Finally, if the Court does issue a PI, Defendants ask that the injunction be limited only to the named grants in Plaintiffs' complaint and motion.

### A. Venue is not proper in the State of Maryland because no substantial part of the events or omissions giving rise to the claim occurred here.

This Court should decline to hear this case because it does not belong in the State of Maryland. In cases based on federal question jurisdiction, venue is only proper in a district where either a defendant resides or where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b) (providing additional venue grounds not relevant here). Because no defendant resides in Maryland and because the grant terminations at issue occurred in eight states but not in Maryland, venue is not proper here.

Although cases involving the federal government are often appropriately brought in the District of Columbia, this may not be appropriate where it would lead to a crush of litigation. In cases involving national organizations "challeng[ing] agency action of nationwide scope," the District of Columbia is nearly always the most convenient venue. *Indus. Union Dep't, AFL-CIO v. Bingham*, 570 F.2d 965, 971 (D.C. Cir. 1977). However, this may not be true where a given district has "limited manpower to process a large number of claims." *Chakrabarti v. U.S. Citizenship and Immigration Servs.*, No 21-1945 PJM, 2021 WL 4458899, at *5 (D. Md. Sept. 29, 2021). Just a few years ago, this District declined to become the default district for hundreds of lawsuits alleging delays in adjudication of immigration applications, merely because the offices of United States Citizenship and Immigration Services moved to the state. *Id.* at *5. Rather, the court

noted that hearing adjudication delay cases in each plaintiff's home district would decrease the burden on the District of Maryland and prevent "derogat[ion] from the other important matters the Court must attend to." *Id.* at *6.

Moreover, simply naming one organizational Plaintiff headquartered in a state who experienced little or no actual harm is not sufficient to establish that "a substantial part of the events" occurred in that given state. *Cf. Wolf v. Menh*, No. 1:18-cv-1180, 2019 WL 13292992, at *3 (E.D. Va. Feb. 5, 2019) (finding receipt of defamatory statements by Virginia individuals and involvement of "a Virginia organization" did not amount to "a substantial part of the events or omissions giving rise to the claim"). Similarly, the fact that some portion of events are experienced in Maryland is not sufficient to establish "a substantial part" where most events occur outside the state. *Chakrabarti*, 2021 WL 4458899, at *3, 7.

Judge Gallagher recently signaled her concern about the District of Maryland becoming a default district for litigation stemming from President Trump's policies. In *Am. Fed. of Teachers, et al. v. Dept. of Ed.*, which involves similar allegations as those in the instant case, Judge Gallagher observed that the complaint contained only "generalized facts describing the impact of certain executive actions on members of two nationwide professional organizations," and "specific, detailed facts" relating to impacts in another state. Letter Order, *Am. Fed. of Teachers, et al. v. Dept. of Ed.*, No. 25-cv-628-SAG, ECF 16 at 1 (Mar. 5, 2025). The only connection to Maryland was not any "harm occurring in the State of Maryland," but rather "the naming of [American Federation of Teacher's] AFT's Maryland chapter as a separate Plaintiff without identifying any particularized injury to the Maryland chapter distinct from the national chapter." *Id.* ("It thus appears to this Court that the Maryland chapter was named separately solely to

manufacture venue in this District."). Judge Gallagher ordered briefing about venue but has not yet ruled on the issue. *Id.*

Her concerns are not misplaced. According to the "Trump Litigation Tracker" compiled by JustSecurity.org, approximately twelve challenges to the administration's actions have been filed in Maryland so far, second only to the District of Columbia, which has more than sixty. *See* Litigation Tracker:    Legal    Challenges    to    Trump    Administration    Actions, https://www.justsecurity.org/107087/tracker-litigation-legal-challenges-trump-administration/ (Last visited Mar. 10, 2025).

Like *AFT* and *Chakrabarti*, venue in this case is not proper in Maryland. Plaintiffs are two national professional organizations and one Maryland chapter. *See e.g.*, ECF 1 at ¶ 14. The complaint's utter lack of connection to Maryland is so striking that not only is the sole Maryland plaintiff the third of three named Plaintiffs, but that plaintiff's principal place of business in Towson, Maryland is misspelled "Townson" – twice. *Id.* The complaint contains no allegations of any grant terminations in Maryland, and the declaration of Plaintiff Maryland Association of Colleges for Teacher Education's ("MACTE") President does not specify whether actual grants were terminated in the State of Maryland, only that three of ten member organizations were "impacted by the termination" of SEED and TQP grants. The complaint does not specifically mention any Maryland grant terminations, but only avers that the termination of others' grants "implicates MACTE's core mission." ECF 1 at ¶ 14. In contrast, the complaint and associated documents allege specific allegations of injury occurring in Illinois, Minnesota, California, District

of Columbia, Wisconsin, Mississippi, Texas, and Arkansas.  *See* ECF 1-2 at 2, 6, 8, 10, 12, 14;

ECF 1 at ¶ 112.  Given these facts, venue is unlikely to be proper in Maryland.[3]

The Court should decline to hear this preliminary injunction challenge and instead allow

the parties to brief the issue of venue transfer pursuant to 28 U.S.C. § 1404.

**B.**   **The complaint lacks sufficient facts to establish Plaintiff MACTE's organizational standing.**

The only Plaintiff with any Maryland connection, MACTE, lacks organizational standing.

"[A] plaintiff must establish that he has standing to challenge each provision . . . by showing that

he was injured by application of those provisions."  *Covenant Media of SC, LLC v. N. Charleston*,

493 F.3d 421, 430 (4th Cir. 2007).  To establish standing, a plaintiff must show: (1) an "injury in

fact," that is, a violation of a legally protected interest that is "concrete and particularized" and

"actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury

and the defendant's conduct such that the injury is "fairly . . . traceable to the challenged action";

and (3) that it is "likely, as opposed to merely speculative that the injury will be redressed by a

favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

An organizational plaintiff cannot establish standing merely by showing an "intens[e]. . .

interest" in the case or "strong opposition to the government's conduct."  *Valley Forge Christian*

*Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982).  The

Supreme Court has emphasized that "threatened injury must be *certainly impending* to constitute

---

[3]   As in *Chakrabarti,* the government currently intends to move to transfer venue to the individual states in which Plaintiffs' grants were cancelled given the current crush of litigation in the District of Columbia.

injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

The complaint and motion for preliminary injunction lack specific allegations regarding actual injury to MACTE. Rather, the complaint alleges only an "implicat[ion of] MACTE's core mission." ECF 1 at ¶ 14. The declaration drafted by MACTE's President does not specifically identify any Maryland grants that were cancelled, but only alleges that three of its ten member organizations were "impacted by the termination of the grants . . . resulting in a substantial loss of funds for teacher preparation programs in Maryland." ECF 5-5 at 2. Unlike the other allegations in the complaint and preliminary injunction motion, there is no indication of which member grants were cancelled if any, or how much money was lost. *See generally, e.g.*, ECF 1-2 (identifying cancelled grants in Illinois, Minnesota, California, and District of Columbia, but none in Maryland).

Moreover, to the extent Maryland grants were terminated, Maryland has already received relief in a different case. *See* Order, *California v. U.S. Dep't of Educ.*, 1:25-cv-10548-MJJ, ECF No. 41 (D. Mass. Mar. 6, 2025) (requiring DOE to "immediately restore" terminated TQP and SEED grants for recipients in Maryland, California, Colorado, Illinois, Massachusetts, New Jersey, New York, and Wisconsin).

Thus, Plaintiff MACTE is unlikely to establish standing.

**C.    Plaintiffs cannot piggyback on *NADOHE*'s analysis because *NADOHE* is not binding and they are differently situated.**

Even though all of Plaintiffs' grant terminations occurred before Judge Abelson issued his order in *NADOHE*, Plaintiffs seek to have that order apply to them retroactively. Although Judge Abelson's decision is due "substantial deference," it is not retroactive nor is it binding on this court. *Nat'l Union Fire Ins. Co. v. Allfirst Bank*, 282 F. Supp. 2d 339, 351 (D. Md. 2003) ("Of

17

course, no decision of a district court judge is technically binding on another district court judge, even within the same district."). The material differences between the instant Plaintiffs and those in *NADOHE* underscores the importance of analyzing the instant case out of the shadow of *NADOHE*. First, Plaintiffs here allege no First Amendment violations. Second, rather than fearing the threat of grant terminations for unknown reasons, the instant Plaintiffs have received definitive notices of grant termination with stated reasons. Third, DOE's decisions in this case were based on the agency's own determinations apart from the J20 order. To the extent *NADOHE* could apply to this case, the Court should decline to extend it.

### 1.    *NADOHE's* holding hinged on First Amendment violations but these Plaintiffs have no First Amendment claim.

A First Amendment violation rested at the core of the *NADOHE* decision. The specter of this free speech infringement permeated every aspect of the Court's decision in *NADOHE*, including its holding that the J20 and J21 EOs were likely void for vagueness under the Fifth Amendment. Plaintiffs allege no such free speech violation here, so the Court should decline to follow *NADOHE*.

Although Judge Abelson found the J20 termination provision void for vagueness, he did so while holding the government to a "more stringent vagueness test" due to the plaintiffs' alleged free speech infringement. *NADOHE*, 2025 WL 573764, at *16 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). As Judge Abelson acknowledged, "[t]he vagueness doctrine analysis is not uniform across all case types." *NADOHE*, 2025 WL 573764, at *18. On the contrary, he observed that courts would have "some tolerance for vagueness" in cases involving "government awards [of] 'selective subsidies'" if it were not for the alleged impingement on free speech. *Id.* This chilling of free speech was also important in the court's weighing of irreparable injury and public interest supporting an injunction. *Id.* at *27–28.

18

The instant Plaintiffs allege no chilling of their right to free speech. Thus, the government should receive the benefit of a vagueness analysis that has "some tolerance for vagueness." *Id.* at *18. This important distinction cautions against applying *NADOHE*'s holding to this case.

2.    ***NADOHE* held that the likelihood of establishing vagueness stemmed from uncertainty regarding grant termination, but the instant Plaintiffs have already had their grants terminated.**

*NADOHE* made two vagueness holdings using the "more stringent vagueness test" required in cases involving a First Amendment violation. *Id.* at *16. First, Judge Abelson found that the termination provision was likely void because "the vagueness of the term 'equity-related' grants or contracts" invites arbitrary and discriminatory enforcement." *Id.* at *19. Second, the Court held that the same term "offers insufficient notice to current grantees about whether and how they can adapt their conduct to avoid termination of their grants or contracts." *Id.* at *20. The fact that no *NADOHE* plaintiff had yet been notified of a grant termination was central to both holdings. *See, e.g.*, *id.* at *3 (acknowledging "Plaintiffs . . . are left to guess . . . whether their federal grants or contracts will be terminated" (internal quotations omitted). Neither of these vagueness holdings should apply to the current Plaintiffs because DOE did terminate their grants.

As to the differences in Judge Abelson's analysis regarding arbitrary and discriminatory enforcement,[4] *NADOHE* focused on the fears of plaintiffs facing uncertain enforcement. *See, e.g.*, *id.* at *3, *20. In contrast, the instant case presents a more concrete question because Plaintiffs challenge the termination of several discrete grants. *See generally*, ECF 1. Judge Abelson acknowledged that the termination provision of the J20 order could be vague as to some while

_____

[4]    This filing addresses the concern about the merits of Plaintiffs' arbitrary and discriminatory enforcement more fully in Section IV.E, below.

giving other grantees "notice that their grants are subject to termination." *NADOHE*, 2025 WL 573764, at *21. Indeed, the District Court for the District of Columbia found that an agency action terminating grants for particularized reasons was distinct from a blanket termination in response to an executive order. *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, __ F. Supp. 3d __, 2025 WL 752378 (D.D.C. Mar. 10, 2025).

So too here, the Court's analysis must focus on whether DOE's termination of Plaintiffs' grants was vague or arbitrary as applied to them. *See Educ. Media Co. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (noting that as-applied challenges are "based on a developed factual record and the application of a statute to a specific person"). Defendants argue it was not. *See* Section IV.E, below. Given the actual grant terminations here, *NADOHE*'s holding should not apply.

### 3.    *NADOHE* challenged the potential enforcement of the J20 termination provision, while the instant case challenges an actual agency decision not definitively tied to the J20 termination provision.

Although Plaintiffs assume DOE terminated their grants because of the J20 Executive Order that *NADOHE* enjoined, DOE does not concede this and the documentary record indicates independent agency review. Judge Abelson held plaintiffs were likely to establish a direct connection between their injuries and the J20 and J21 EOs because the plaintiffs received letters explicitly tying potential grant termination to the EOs. *NADOHE*, 2025 WL 573764, at *11. Thus, Judge Abelson's analysis of the constitutionality of the EOs more directly applied to the plaintiffs' challenge.

But no such direct communication link here. Plaintiffs attached DOE's communications terminating their grants, and each communication cited to applicable provisions of the Code of Federal Regulations ("CFR") and more general changes in overarching "Department priorities." *See, e.g.*, ECF 5-8 at 23–24. The letters cite to a determination by the "Acting Secretary of

Education" based on "constitutional and statutory law." *Id.* (going on to identify the constitutional and statutory authority). Because *NADOHE* focuses on a facial challenge to the J20 and J21 EOs, and the instant case focuses on a series of discrete grant terminations stemming from an agency action, the Court should decline to extend *NADOHE*'s reasoning.

In sum, although Judge Abelson's opinion in *NADOHE* deserves deference from this Court, the decision is not binding and material differences between *NADOHE* and this case caution against extending it.

### D.    Plaintiffs are unlikely to succeed on the merits of their vagueness claim.

Plaintiffs' Fifth Amendment vagueness claim fails because their grant terminations were not vague. "A statute is unconstitutionally vague if it (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement." *United States v. Saunders*, 828 F.3d 198, 206 (4th Cir. 2016) (citation omitted). To assess fair notice, courts ask whether "the ordinary person exercising ordinary common sense can sufficiently understand" the language. *Id.* (quoting *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012)). Courts also consider whether unclear language may encourage arbitrary and discriminatory enforcement. *United States v. Davis*, 588 U.S. 445, 451 (2019). Because the grant terminations specified the reasons for the termination, and because both the complaint and the preliminary injunction motion identified the grant features that fall under the "DEI" umbrella, the terminations were not vague.

Where a Fifth Amendment challenge involves the impact of economic policies to organizations and does not implicate a free speech concern, courts apply a relaxed vagueness test. *Hoffman Estates,* 455 U.S. at 498 (holding that "economic regulation" is subject to "a less strict vagueness test" compared to criminal statutes, since "businesses, which face economic demands

to plan behavior carefully, can be expected to consult relevant legislation in advance of action").

*Compare id.* at 499 (noting that "the most important factor affecting the clarity that the Constitution

demands of a law is whether it . . . interferes with the right of free speech") *with* ECF 1 (failing to

raise any free speech claim). Generally, "[a] civil statute . . . that does not implicate

constitutionally-protected conduct is not unconstitutional unless it is 'impermissibly vague in all

of its applications.'" *Havtech, LLC v. AAON Inc.*, No. CV SAG-22-00453, 2023 WL 200117, at

\*4 (D. Md. Jan. 17, 2023) (quoting *Hoffman Estates*, 455 U.S. at 495).

Courts are particularly generous when it comes to selective government subsidies, applying

a relaxed vagueness analysis to imprecise government priorities. *Nat'l Endowment for the Arts v.*

*Finley*, 524 U.S. 569, 589 (1998). *See also Grayned v. City of Rockford*, 408 U.S. 104 (1972)

("Condemned to the use of words, we can never expect mathematical certainty from our

language."). For example, where challenged language does not provide definitions but the words

"can be interpreted by people of common intelligence," no additional definition is required.

*Havtech*, 2023 WL 200117, at \*5 (internal quotation omitted). *See also Finley*, 524 U.S. at 589

(noting that scholarships and grants awarded for "subjective criteria such as 'excellence'" are

selective subsidies not void for vagueness). Moreover, where challenged language may have

differing definitions but there is no real dispute for the existing plaintiffs of the language's

application, the language is not vague. *See Wilson v. PL Phase One Operations L.P.*, 422 F. Supp.

3d 971, 983 (D. Md. 2019).

Here, DOE provided grant termination letters that specified the reasons for each grant

termination. The letters explain that DOE grants will no longer support "diversity, equity, and

inclusion ("DEI") initiatives." *See, e.g.*, ECF 1-2 at 8 (noting that DOE will not fund any other

forms of unlawful discrimination, either). The letters also note that the terminated grant programs

"take part in DEI initiatives" or other forms of unlawful discrimination. *Id.* The letters also cite to the specific sections of the CFR that allow DOE to terminate grants due to changes in "Department priorities." *Id.* (referencing 2 C.F.R. § 200.340(a)(4), 34 C.F.R. § 75.253, and 2 C.F.R. § 200.339-43). Although Plaintiffs complain that they were not "put . . . on notice for the reason for the grant termination," this is not genuine given the letters' explanations. ECF 5-1 n.10.

Moreover, any claim that the terms "diversity," "equity," and "inclusion" are vague is belied by the fact that not only did Plaintiffs use these very words in naming their grant projects and describing their programs, but these terms also appeared in the solicitation for grant applications DOE published in the Federal Register when Plaintiffs applied for their grant funding. *See, e.g.*, ECF 1 at ¶¶ 79, 81, 101 (describing terminated grants as involving diversity, equity, and inclusion); 89 F.R. 23573 (TQP application notice, which includes the words diversity, equity, and inclusion); 87 F.R. 19487-01 (same for the SEED application notice); 88 F.R. 33592 (same for the TSL notice). Plaintiffs also identified these program components in their complaint, suggesting their awareness of the reasons for their grant termination. In other words, Plaintiffs knew what these terms meant when they applied for funding and when they filed the instant complaint, so it is a fair inference that they also knew what they meant when they read the termination letters. These terms are not vague, especially under the more relaxed standard applicable to selective funding decisions like government grants.

### E. Plaintiffs are unlikely to succeed on their APA claim because enacting a new administration's priorities, consistent with federal law, is not arbitrary or capricious.

Plaintiffs' APA claim is also unavailing. Plaintiffs' singular point in support of their arbitrary and capricious argument is that DOE acted "contrary to the law" by failing to publish any change in "Department priorities" in the Federal Register with a "notice and comment" period.

ECF 5-1 at 27.  They do not clearly allege any other procedural irregularities establishing arbitrary and capricious agency action.[56]  This one argument cannot carry the day because there is no requirement that big-picture Department priorities follow the same public rulemaking and commenting process as priorities for grant awards.

"Arbitrary and capricious" is a "narrow" standard of review in which DOE's action is presumed valid.  *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) (narrow standard); *Nat. Res. Def. Council, Inc. v. Envtl. Prot. Agency*, 16 F.3d 1395, 1400 (4th Cir. 1993) (presumed validity).  The Court merely "consider[s] whether the agency considered the relevant factors and whether a clear error of judgment was made."  *Hoffler v. Mattis*, 677 Fed. Appx. 119, 120 (4th Cir. 2017) (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)).  In other words, courts ask if "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  The APA is not a mechanism for judicial policy revision, because "courts lack authority 'to impose upon [an] agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good.'"  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (cleaned up)

---

[5]    It is unclear whether Plaintiffs allege that placement on "route pay" constitutes arbitrary and capricious agency action.  Although their filings reference the route pay condition, the argument is not fleshed out in their motion.

[6]    Of note, the plaintiffs in *California v. U.S. Dep't of Educ.* appear to have advanced different APA arguments in support of their TRO motion not offered by Plaintiffs in the instant case.  *See* Order, 1:25-cv-10548-MJJ, ECF No. 41 (D. Mass. Mar. 6, 2025) (referencing lack of "individualized analysis of any of the programs" in termination letters).

(quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 549 (1978)).

Federal regulations explicitly allow agencies to terminate grants for no other reason besides "an award no longer effectuates . . . agency priorities." 2 C.F.R. § 200.340. This language came from Office of Management and Budget (OMB) changes to Uniform Guidance in the year 2020. Guidance for Grants and Agreements, Published Doc. No. 2020-17468, 85 FR 49506 (Aug. 13, 2020), available at https://www.federalregister.gov/documents/2020/08/13/2020-17468/guidance-for-grants-and-agreements (last visited Mar. 11, 2025). The comments to this change to the Uniform Guidance note that the language is meant to allow "awarding agencies [to] prioritize ongoing support to Federal awards that meet program goals" and "terminate the Federal award" where it does not. *Id.*

Plaintiffs argue that "Department priorities" may only change if subjected to a notice and comment period pursuant to 20 U.S.C. § 1232(d) and 34 C.F.R. § 75.105(b)(2). ECF 5-1 at 22–23. These provisions do not support Plaintiffs' argument. § 1232(d) governs regulations and § 75.105(b)(2) governs annual priorities. Neither of these regulations relate to the big-picture departmental priorities that changed with the new Presidential administration, and neither undermines the ability of a federal agency to terminate an award for no longer aligning with agency priorities. Rather, the regulations distinguish between "annual absolute, competitive preference, and invitational priorities," as identified and described in 34 C.F.R. § 75.105, and general Agency or Administrative priorities, as referred to in 2 C.F.R. § 200.340(a)(4). The fact that two different regulations from two different chapters of the CFR address the different types of priorities underscores the distinction between them.

"Annual absolute, competitive preference, and invitational priorities" are specific priorities established by the Secretary of Education which are utilized in Agency grant programs. *See* 34 C.F.R. § 75.105. Per 34 C.F.R. § 75.105, such priorities are used for selection of applications for Agency programs. Annual absolute, competitive preference, and invitational priorities are subject to a notice and comment period and rulemaking, unless an exemption applies. *Id.* Unlike these specific annual absolute, competitive preference, and invitational priorities, Agency or Administration priorities are general and issued at the discretion of the Agency or Administration. Agency and Administration priorities stem from an Agency or Administration's mission and agenda and can be changed at any time without a vote or notice and comment from the public. Plaintiff's interpretation of federal regulation renders every federal agency powerless to shift its activities with new Presidential administrations absent a lengthy public rulemaking process. There is no authority for the proposition that agencies must go through this process any time they change their overarching policies or goals.

It is true that an agency's ability to terminate funding pursuant to 2 C.F.R. § 200.340 is relatively untested and there is a paucity of caselaw interpreting the provision. An Ohio State Law Journal article considered 2 C.F.R. § 200.340 and acknowledged that, before President Trump's first administration, "[t]erminating multiyear grants simply because of a claimed change in priority was . . . unheard of" and "clearly illegal." Eloise Pasachoff, *Executive Branch Control of Federal Grants: Policy, Pork, and Punishment*, 83 Ohio St. L.J. 1113, 1184 (2022). The current § 200.340 language allowing unilateral termination of a federal grant award "if [it] no longer effectuates the program goals or agency priorities" only appeared in 2020 towards the end of President Trump's first term and did not see much use during the Biden administration. *Id.* But the language makes such a funding termination consistent with federal regulations. While Ms. Pasachoff's article

26

acknowledges the "troublesome" implications of this change, including "fuel[ing] autocracy," she also acknowledges that the plain language of the regulation allows an agency, consistently with the law, to terminate grant funding "because the President or other senior political officials say so." *Id.*

Because Plaintiffs' "arbitrary and capricious" argument is likely to fail, preliminary injunction is further unwarranted.

### F.    Two of the final three preliminary injunction factors – balance of equities and public interest – weigh in favor of the Government.

In addition to proving likelihood of success on the merits, Plaintiffs must also show irreparable harm and that the balance of equities and public interest weigh in their favor.  For the purposes of this motion only, Defendants do not contest that Plaintiffs can establish irreparable harm.  However, the final two factors weigh in the government's favor and compel denial of Plaintiffs' motion.

The balance of the equities and the public interest "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken*, 556 U.S. at 435).  To balance the equities, the Court considers "the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)).  Irreparable harm to Plaintiffs is not decisive.  *See Ass'n of Jewish Camp Operators v. Cuomo*, 470 F. Supp. 3d 197, 228–29 (N.D.N.Y. 2020) (finding irreparable harm to Plaintiffs from closure of overnight camps, but still finding important governmental interest weighed against preliminary injunction).

While Plaintiffs' Complaint and motion lay out the public interest in favor of an injunction, there are several compelling interests that weigh against an injunction.  First, the government and

the public both have a compelling interest in ending discrimination.  In 2023, the Supreme Court recognized that educational policies or programs favoring one race – even a historically disadvantaged race – were not equitable but instead were discriminatory.  *SFFA*, 600 U.S. at 206. DOE must be allowed to act upon this binding interpretation of federal civil rights laws by ending its support for programs that show preferences based on protected class.

Second, although many Americans support diversity, equity, and inclusion programs, many others view DEI policies as a scourge, "creating new prejudices and allowing old ones to fester," causing some to "resent members of what they perceive to be favored races, believing that the successes of those individuals are unearned."  *SFFA*, 600 U.S. at 275–76 (Thomas, J., concurring). The public interest in ending DEI must be weighed against the preference of those who wish to keep it.

Finally, the Court is charged with protecting *all* Americans, which requires the Court to weigh the interest of more than seventy-seven million people who voted for President Trump in the 2024 Presidential election.  These Americans voted for a President who openly and fervently campaigned on the promise to end diversity, equity, and inclusion in all its forms.  *See, e.g.*, Alexis Agathocleous et al., *Trump on DEI and Anti-Discrimination Law*, ACLU.org, at 2 (Jul. 2, 2024), https://www.aclu.org/publications/trump-on-dei-and-anti-discrimination-law ("The 2024 Trump campaign . . . has promised . . . to eradicate both public and private diversity, equity, and inclusion (DEI) policies); *id.* ("Trump has promised to cut federal funding for schools with curricula that touch on these 'disfavored' subjects. . . ."); Jessica Guynn, *RIP DEI? The war on 'woke' America has a new commander-in-chief*, USAtoday.com (Nov. 22, 2024), https://www.usatoday.com/story/money/2024/11/22/rip-dei-donald-trump-president/76116276007/ ("On the campaign trail, Donald Trump promoted the idea that white

Americans were targets of racism and made reversing Joe Biden's 'woke takeover' of Washington a priority of his second term in office. . . . On the chopping block:  diversity, equity, and inclusion programs.").  The President's DEI agenda was no secret.

While it may be an understatement to say that not everyone agrees with President Trump's views on DEI, his voters have a significant public interest in ending DEI as quickly as possible. *See, e.g.*, Eliza Collins & Elizabeth Findell, *The Minority Voters Who Love Trump's Dismantling of DEI*, MSN.com (Feb. 9, 2025), https://www.msn.com/en-us/news/politics/the-minority-voters-who-love-trump-s-dismantling-of-dei/ar-AA1yGJ0B (originally published in the Wall Street Journal) (quoting Latino man as saying, "I'm very happy that DEI is hopefully going to disappear starting from the government and hopefully it'll catch on") [hereafter, "*Minority Voters*"]; Ingrid Jacques, *Trump is waging war against DEI in schools.  New incidents show why he's right.*, MSN.com (Mar. 5, 2025), https://www.msn.com/en-us/news/opinion/trump-is-waging-war-against-dei-in-schools-new-incidents-show-why-he-s-right-opinion/ar-AA1AcXrc (originally published in USA Today) ("The innocuous sounding goals of this [DEI] ideology . . . have in practice had the opposite effect – promoting division and suspicion.").  A balance of equities and the public interest also must factor in the plurality of the country who have a substantial interest in ensuring that millions in federal grant money is not forever lost to these terminated grant programs.

### G.    To the extent the Court is inclined to grant a preliminary injunction, it should instead remand to DOE for further development of the record.

Due to the expedited preliminary injunction briefing schedule, there was not sufficient time to assemble a thorough evidentiary record to show that DOE's grant terminations were not based on the J20 and J21 EOs, were consistent with federal civil rights law, and were based on particularized issues with each program.

To the extent the Court considers granting a preliminary injunction, Defendants respectfully request the Court instead remand the matter back to DOE to provide a more detailed explanation for each grant termination on an expedited schedule.[7]  Armed with a more grant-specific explanation, Plaintiffs could then determine whether they still wish to pursue legal action and the Court could then reconsider the matter with a more fulsome record.  Courts allowed for similar remands in *Prometheus* and *AIDS*.  *See, e.g.*, *Prometheus*, 592 U.S. at 422; *AIDS*, 2025 WL 752378, at *13.

Moreover, to the extent Plaintiffs argue that imposition of route pay was arbitrary and capricious – an argument referenced in the complaint but not fully fleshed out in their motion – DOE can also resolve any lack of specificity and notice on remand.

### H.    If the Court grants a preliminary injunction, its scope should be limited only to the cancelled grants identified in Plaintiffs' motion.

To the extent the Court decides a preliminary injunction is appropriate, the Court should limit relief only to the cancelled grants specifically identified in the complaint and motion for preliminary injunction.  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017) (noting courts may "mold its decree to meet the exigencies of the particular case" (internal quotations omitted)).  Due to the potential variation in grant entitlement, amount of harm, extent of funding, and degree of mismatch between a grant recipient and department priorities, issuing a

---

[7]     It does not appear that Judge Joun considered the possibility of remand in *California v. Dept. of Educ.*, despite concerns that the termination letters failed to provide "a reasoned explanation" for termination.  Order, 1:25-cv-10548-MJJ, ECF No. 41 at 5 (D. Mass. Mar. 6, 2025).  It is unclear whether either party raised the possibility of an agency remand.

nationwide order that applies to undisclosed terminated grants by both parties and nonparties would amount to overbroad relief.

## V.   **CONCLUSION**

For the foregoing reasons, the Court should deny the motion for improper venue and lack of standing, or allow the parties to brief a venue transfer. If the Court reaches the merits, it should deny the motion. Alternatively, the Court should remand to DOE to provide a more specific explanation for the grant terminations. Finally, if the Court grants the PI, it should limit the scope of the PI to only the grants specifically identified in the Complaint and motion.

Respectfully submitted,

KELLY O. HAYES
U.S. Attorney

_____/s/_____
Molissa H. Farber (802255)
Assistant U.S. Attorney
U.S. Attorney's Office, District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4862
Molissa.Farber@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I filed a copy of the foregoing response, along with accompanying exhibits, via the Court's CM/ECF system, which automatically transmitted a copy to all registered parties.  I further certify that my office will provide a courtesy copy of this filing and supporting materials to chambers pursuant to the Court's Order at ECF 18.


       /s/ Molissa H. Farber
Molissa H. Farber